# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MARGARET MURR, individually and on behalf of all others similarly situated, <br><br>        Plaintiff, <br><br> v. <br><br> CAPITAL ONE BANK (USA), N.A., <br><br>        Defendant. | **Case No. 1:13-cv-1091 (LMB/TCB)** |

## CAPITAL ONE'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ...................................................................................................1

UNDISPUTED FACTS ...........................................................................................3

STANDARD OF REVIEW ....................................................................................11

ARGUMENT ........................................................................................................11

I.   Capital One Is Entitled To Summary Judgment On All Of Murr's Claims For
     Breach Of Contract (Count III)....................................................................11

     A.   The actions of Capital One that Murr challenges as breaches were all
          authorized by the contract governing her account. ................................12

          1.   Capital One properly calculated the amount of Murr's minimum
               payments. ..................................................................................12

          2.   Capital One properly applied Murr's minimum payments to her
               0% balance. ...............................................................................14

          3.   Capital One properly charged Murr interest on new purchases
               without a grace period after she began carrying a balance on her
               account. .....................................................................................15

     B.   In the alternative, Murr did not accept the 0% offer and thus cannot sue for
          breach of its terms. ............................................................................17

II.  Capital One Is Entitled To Summary Judgment On All Of Murr's Claims For
     Fraud (Counts I, II, and VII). ......................................................................18

     A.   Murr's fraud claims are based on alleged omissions and are therefore
          preempted by the National Bank Act and its implementing regulations. ..............19

     B.   Capital One disclosed, in written contractual documents, every contractual
          term that Murr alleges was omitted, so her fraud claims fail on their own
          terms.……...........................................................................................24

III. Capital One Is Entitled To Summary Judgment On All Of Murr's TILA Claims
     (Count V). ...................................................................................................26

     A.   Most of Murr's TILA claims are time barred. .......................................26

     B.   The remaining TILA claims fail on the merits because Capital One did not
          change the terms governing repayment of an outstanding balance and did
          not charge a penalty for on-time payments...........................................27

IV.  Murr Does Not State A Claim Under The FCBA Because She Did Not Raise A
     "Billing Error" With Capital One (Count VI)...............................................28

V.   Murr's Claim For Declaratory Judgment Falls With Her Substantive Claims
     (Count VIII). ...............................................................................................30

CONCLUSION......................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
   517 U.S. 25 (1996)......................................................................................20

*Barton v. Capital One, Bank (USA), N.A.*,
   No. 12-cv-05412-JST (N.D. Cal. Apr. 16, 2013) (Dkt. 43) ........................... passim

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).....................................................................................11

*Cunningham v. Bank One*,
   487 F. Supp. 2d 1189 (W.D. Wash. 2007)..............................................29

*Epps v. JP Morgan Chase Bank, N.A.*,
   675 F.3d 315 (4th Cir. 2012).....................................................................21

*Esquibel v. Chase Manhattan Bank USA, N.A.*,
   487 F. Supp. 2d 818 (S.D. Tex. 2007).....................................................29

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982).....................................................................................20

*First Nat'l Bank v. California*,
   262 U.S. 366 (1923).....................................................................................19

*Gutierrez v. Wells Fargo Bank*,
   704 F.3d 712 (9th Cir. 2012).........................................................20, 21, 24

*Kroeze v. Chloride Grp. Ltd.*,
   572 F.2d 1099 (5th Cir. 1978).....................................................................17

*Langenfeld v. Chase Bank U.S., N.A.*,
   537 F. Supp. 1181 (N.D. Okla. 2008)......................................................29

*Loomis v. U.S. Bank Home Mortg.*,
   912 F. Supp. 2d 848 (D. Ariz. 2012).......................................................25

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
   439 U.S. 299 (1978).....................................................................................19

*McCauley v. Home Loan Inv. Bank, F.S.B.*,
   710 F.3d 551 (4th Cir. 2013).................................................................21, 24

*McCorkle v. First Penn. Banking & Trust Co.*,
   459 F.2d 243 (4th Cir. 1982).....................................................................30

*Michael v. Sentara Health Sys.*,
939 F. Supp. 1220 (E.D. Va. 1996) ...................................................................11

*O'Donnell v. Bank of Am., Nat'l Ass'n*,
504 F. App'x 566 (9th Cir. 2013) ....................................................................24

*Riehle v. Bank of Am., N.A.*,
No. CV-13-00251, 2013 WL 16944442 (D. Ariz. Apr. 18, 2013)..........................23

*Roach v. Option One Mortg. Corp.*,
598 F. Supp. 2d 741 (E.D. Va. 2009) ...............................................................26

*Rose v. Chase Bank USA, N.A.*,
513 F.3d 1032 (9th Cir. 2008) ....................................................................20, 21

*Shamberger v. Wells Fargo Bank, N.A.*,
No. 3:13-cv-645, 2013 WL 6019248 (E.D. Va. Nov. 13, 2013) ...........................26

*Watters v. Wachovia Bank, N.A.*,
550 U.S. 1 (2007)..........................................................................................19

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995).......................................................................................30

*Zurich Ins. Co. v. Alvarez*,
669 F. Supp. 307 (C.D. Cal. 1987)...................................................................30

**STATE CASES**

*Berry v. Klinger*,
300 S.E.2d 792 (Va. 1983) .............................................................................16

*Chang v. First Colonial Sav. Bank*,
410 S.E.2d 928 (Va. 1991) .............................................................................17

*D.C. McLain, Inc. v. Arlington Cnty.*,
452 S.E.2d 659 (Va. 1995) .............................................................................16

*Daru v. Martin*,
363 P.2d 61 (Ariz. 1961) ................................................................................18

*Dewberry & Davis, Inc. v. C3NS, Inc.*,
732 S.E.2d 239 (Va. 2012) .............................................................................18

*Envt. Staffing Acquisition Corp. v. B&R Constr. Mgmt.*,
725 S.E.2d 550 (Va. 2012) .............................................................................16

*Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., Inc.*,
397 S.E.2d 876 (Va. 1990) .............................................................................18

iii

*ITT Hartford Grp., Inc. v. Va. Fin. Assocs., Inc.*,
  520 S.E.2d 355 (Va. 1999) ........................................................................................23, 25

*Kuehn v. Stanley*,
  91 P.3d 346 (Ariz. App. 2004) ............................................................................................25

*Lambert v. Downtown Garage, Inc.*,
  553 S.E.2d 714 (Va. 2001) ..................................................................................................23

*Larkey v. Health Net Life Ins. Co.*,
  No. 1 CA-CV 11-0523, 2012 WL 2154185 (Ariz. App. June 14, 2012) ...............................23

*Law v. Sidney*,
  53 P.2d 64 (Ariz. 1936) ......................................................................................................23

*Lumbermen's Underwriting Alliance v. Dave's Cabinet, Inc.*,
  520 S.E.2d 362 (Va. 1999) ..................................................................................................25

*Mgmt. Enters., Inc. v. Thorncroft Co., Inc.*,
  416 S.E.2d 229 (Va. 1992) ..................................................................................................18

*Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*,
  662 S.E.2d 77 (Va. 2008) ....................................................................................................12

*People Life Ins. Co. v. Parker*,
  20 S.E.2d 485 (Va. 1942) ....................................................................................................16

*PMA Capital Ins. Co. v. US Airways, Inc.*,
  626 S.E.2d 369 (Va. 2006) ..................................................................................................16

*Spence v. Griffin*,
  372 S.E.2d 595 (Va. 1988) ..................................................................................................25

*Sunrise Continuing Care, LLC v. Wright*,
  671 S.E.2d 132 (Va. 2009) ..................................................................................................12

**FEDERAL STATUTES**

12 U.S.C. § 24 ...............................................................................................................19, 20, 21

12 U.S.C. § 1461 *et seq.* .......................................................................................................21

15 U.S.C. §§ 1637 *et seq.* ...........................................................................................24, 26, 27, 28

15 U.S.C. § 1640(e) ..............................................................................................................26, 27

15 U.S.C. § 1666 *et seq.* ............................................................................................... passim

28 U.S.C. §§ 2201, 2202 ..........................................................................................................30

**STATE STATUTES**

A.R.S. § 44-1521, *et seq.* ................................................................................................18

A.R.S. § 44-1522 ............................................................................................................25

**RULES**

Fed. R. Civ. P. 56(a) ......................................................................................................11

**REGULATIONS**

12 C.F.R. § 7.4008(d)............................................................................................ passim

12 C.F.R. § 560.2 ...........................................................................................................21

12 C.F.R. § 1026.9(b)(3) ......................................................................................2, 19, 24

## <u>INTRODUCTION</u>

Plaintiff Margaret Murr opened a credit card account with Capital One in 2009. She used the card regularly but never carried a balance and never read the contractual documents for her account. In 2012, Murr received a mailer offering access checks under her account that would carry a 0% APR for 12 months in exchange for a 2% fee. Having never read the contractual documents, Murr did not know the rules regarding minimum payments and grace periods. Murr's husband, William Murr, contrary to the limits on who could use the offer, wrote one of the checks to pay $4,358.80 in property taxes for an Arizona home the couple held in trust. Murr did not pay off that balance but began carrying it on her account. As the contract provided, Capital One took the balance into account in calculating the amount of Murr's monthly minimum payments, applied her minimum payments to her 0% balance (with amounts above the minimum going to purchases), and charged her interest on new purchases without a grace period. Murr alleges that these actions breached the contract or, in the alternative, that Capital One committed fraud by not disclosing the contractual terms to her. Murr is wrong on all counts.

**Contract claims**. First, the contractual documents governing Murr's account authorized Capital One to take each of the actions that Murr challenges as breaches. Regarding payments, the Customer Agreement and Disclosures that Murr received at account opening stipulated that she would make monthly minimum payments of 1% of her account's principal balance plus interest and fees, and that the minimum payments would be applied to lower-rate balances before higher-rate balances. Regarding grace periods, those same contractual documents, along with every monthly Statement Murr received, stated that Murr would receive a monthly grace period on purchases only if she paid off her entire account balance the previous month. Murr admitted in her deposition that the 0% offer did not contain any additional representations regarding the minimum payment or grace period. Her claim for breach of contract therefore fails as a matter of

law, as a previous federal district court held on the same contract in *Barton v. Capital One Bank (USA), N.A.*, No. 12-cv-05412-JST, (N.D. Cal. Apr. 16, 2013) (Dkt. 43, Slip Op. at 6) (attached to the Declaration of Hanna Terhaar ("Terhaar Decl.") at Ex. A). An additional reason for granting summary judgment to Capital One is that Murr did not accept the 0% offer according to its terms. Her husband signed and used the access check, but the offer expressly prohibited Mrs. Murr from allowing another person to use the checks, even an authorized user on the account. Murr thus has no contract to enforce based on that offer.

**Fraud claims.** Murr argues in the alternative that Capital One committed fraud under Virginia and Arizona law by failing to disclose the terms of the contract in the 0% offer. This claim is preempted by the National Bank Act and its implementing regulations, which provide that Capital One may lend money "without regard to state law limitations concerning . . . [d]isclosure and advertising." 12 C.F.R. § 7.4008(d)(8). Federal regulations specifically prescribe what banks must disclose in offers for "checks that can be used to assess a credit card account." 12 C.F.R. § 1026.9(b)(3). Any attempt to use a state law to impose different requirements is preempted, as the *Barton* decision held in dismissing identical claims brought under California law. In addition, there was no omission because Capital One disclosed all the allegedly omitted contractual terms *in the contractual documents* it sent Murr.

**Remaining claims.** Murr's remaining claims also fail at summary judgment. Her claims under the Truth In Lending Act are either time barred or invoke provisions of the statute that do not apply. The Fair Credit Billing Act does not apply because none of the practices that Murr challenged in the letter she sent to Capital One is a "billing error" under that Act.

2

Capital One's 0% offers provide tremendous value to consumers who otherwise would have to borrow money at high rates on other cards. Murr provides no legal basis for her claims challenging her 0% offer. Summary judgment should therefore be entered for Capital One.

## UNDISPUTED FACTS

**Murr's Capital One credit card account.** In 2009, Plaintiff Margaret Murr opened a credit card account with Capital One. (Dep. of Margaret Murr, attached to Terhaar Decl. at Ex. B ("Murr Dep.") at 15:14-17; Murr Dep. Ex. 2 (attached to Terhaar Decl. at Ex. C).) The contractual documents that govern her account are listed in the Customer Agreement she received at account opening. (Murr Dep. Ex. 3 (attached to Terhaar Decl. at Ex. D) at PLTFMURR-055.) Those documents include:

- the Customer Agreement, (*id.*);

- the Disclosures required by the Truth In Lending Act that Capital One sent Murr at account opening, (Murr Dep. Ex. 2); and

- the Statements Capital One sent Murr each month, (Murr Dep. Exs. 4, 8).

Murr testified that she did not read the contractual terms on any of these documents until after her husband used the 0% access check. (Murr Dep. 52:1-24 (regarding monthly statements); *id.* at 15:18-21 (regarding TILA disclosures); *id*. at 16:7-23, 89:14-90:10 (regarding the Customer Agreement).)

**The design and terms of the 0% offer that Capital One sent to Murr.** In September 2012, Capital One sent Murr a mailer offering access checks to draw on the credit on her account at a 0% Annual Percentage Rate ("APR") for 12 months, in exchange for a 2% transaction fee. (Murr Dep. Ex. 5 (attached to Terhaar Decl. at Ex. F).) Capital One's 0% offers are designed for customers who are either already carrying credit card debt or who will have to incur that debt for a new purchase. (Dep. of Matthew Vischulis, attached to Terhaar Decl. at Ex. I ("Vischulis

Dep") at 311:7-312:5.) For those customers, the 0% offers present the chance to save a substantial amount of money by paying only a 2% fee versus the interest they would otherwise have to pay on another card or financing from a store, which often is very high. (*Id.*; *see also id.* at 64:23-65:12; Dep. of Jackson Barnes, attached to Terhaar Decl. at Ex. J ("Barnes Dep.") at 46:4-22.) The customers benefit by paying less interest, and Capital One benefits by increasing its market share by assuming the balance that would otherwise be held by a competitor. (Barnes Dep. 67:18-68:25.)

The process for identifying customers who can benefit from the 0% offers is not an exact one. Capital One tries to identify those customers by examining monthly credit reports for large balances on their accounts with other lenders. (Barnes Dep. 46:16-49:13; Vischulis Dep. 311:7-312:5.) Often, large balances on those other accounts indicate that a customer is using a credit card to carry debt and thus could benefit from the 0% offer. (*Id.*) But sometimes, a large balance is caused by a customer running large monthly volumes through a card that is paid off each month. (*Id.*) The information Capital One receives from the credit reports is not enough to distinguish between the two, and thus despite its best efforts it sometimes extends 0% offers to customers who would not benefit from them. (*Id.*; Vischulis Dep. 293:9-295:20.) Usually, those customers choose not to use the offers and discard them.

Murr was not the type of consumer for whom the 0% offer was designed. Unlike most consumers who use the 0% checks, the Murrs did not need to borrow the money. Murr testified that they "could have" paid the taxes in cash, "but we chose not to." (Murr Dep. 25:13-16.) When asked, "why did you decide to pay the $87.17 [the 2% fee] to pay the property taxes" instead of paying cash, Murr answered, "We just chose to do it, that's all. I can't give you a

reason. I just chose to do it." (Murr Dep. 28:14, 24-25; *see also id.* at 31:7 ("I don't have a reason for you.").)

Although the 0% offer was limited to Murr and provided that authorized users on her account could not use the checks, Murr's husband, William Murr, wrote an access check in the amount of $4,358.80, signing his own name, to pay the property taxes owed on a home owned in trust for the Murrs. (Murr Dep. at 26:21-27:7.)



(Murr Dep. Ex. 6 (attached to Terhaar Decl. at Ex. G).)

**Murr's experience with the 0% offer.** When the access check that Mr. Murr wrote was processed, the $4,358.80 was added to Murr's Capital One credit card as a special transfer balance. (Murr Dep. Ex. 8 at MURR-COF-4692 (attached to Terhaar Decl. at Ex. H); Barnes Dep. 128:4-13.) As the 0% offer provided, Murr was charged 2% of the transferred amount as a one-time fee. (Murr Dep. Ex. 8 at MURR-COF-4694 (reflecting charge of $87.17 for "SPECIAL RATE OFFER – FEE"); Murr Dep. 62:13-18 (admitting she was charged exactly 2%).)

It is undisputed that Murr received the promised 0% rate on the access-check balance. Murr's Monthly statements show that she was never charged interest on the "special transfer" segment where the balance was posted.

**INTEREST CHARGE CALCULATION**

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 13.90%P | $958.22 | $11.31 |
| Cash Advances | 24.90%P | $0.00 | $0.00 |
| SpecialTrans | 0.00% | $4,405.85 | $0.00 |

P,L,D,F = Variable Rate. See reverse of page 1 for details

(Murr Dep. Ex. 8 at MURR-COF00004698; *see also id.* at MURR-COF00004702, MURR-COF00004704, MURR-COF00004708, MURR-COF00004712, MURR-COF00004716, MURR-COF00004720, MURR-COF00004724, MURR-COF00004726.) Murr agreed in her deposition that she was not charged any interest on the access-check balance:

> Q:   So I just want to make sure that we're really clear here, that having reviewed this statement and the other statements, your understanding now is that the extra interest that was charged on your account was charged on purchases and not on the 0 percent balance.
> A:   Okay.

(Murr Dep. 40:21-41:1.)

It is also undisputed that Capital One required Murr to make a minimum payment each month of 1% of the total balance of her account, plus interest and fees, and that it applied that minimum payment to her 0% balance. (Vischulis Dep. 231:18-23; *id*. at 234:13-235:2; Dkt. 1 ¶¶ 15, 25, 26; Murr Dep. 72:15-22; Barnes Dep. 91:4-19.)

Finally, it is also undisputed that Capital One charged Murr interest on new purchases without a grace period after she began carrying a balance on her account. (Murr Dep. 40:1-41:1; Murr Dep. Ex. 8; Barnes Dep. 95:8-12; 121:10-124:7.) The total interest that Murr paid on purchases because of the 0% balance is, at most, $26.16. (Murr Dep. 109:20-110:19; Murr Dep. Ex. 8 at MURR-COF00004698, MURR-COF00004702, MURR-COF00004704, MURR-COF00004708, MURR-COF00004712, MURR-COF00004716, MURR-COF00004720, MURR-COF00004724, MURR-COF00004726.)

6

Between January 2013 and July 2013, Murr made no payments on her Capital One account, despite receiving statements indicating she owed a minimum payment. In July 2013, after Murr failed to make payments for 180 days, her account was charged off and the remaining balance was immediately due and payable under the terms of her Customer Agreement. (Murr Dep. Ex. 8 at MURR-COF-00004728.) In August 2013, Murr paid $4,368.50 of the $4,535.89 owed on her account. Capital One has not pursued the remaining $167.39. (*See* MURR-COF00004726 (showing a final balance of $4533.30) and MURR-COF-00004389 (attached to Terhaar Decl. at Ex. K) (showing a final payment on August 7, 2013 of $4,358.60.)

**The contractual terms relevant to Murr's claims. Minimum payments**. The contractual terms governing how Capital One will calculate and apply Murr's minimum payments are set forth in the documents she received at account opening. The Disclosures state that Capital One will calculate the amount of Murr's minimum payment by taking 1% of her outstanding balance:

> **How Do You Calculate My Minimum Payment?**  If your balance is less than $15 your minimum payment will equal your balance. Otherwise your minimum payment will be the greater of $15 or 1% of your balance plus interest (periodic finance charges) and late payment fees.

(Murr Dep. Ex. 2 at 7.) Both the Disclosures and the Customer Agreement specify that Capital One will apply Murr's minimum payments to lower-rate balances before higher ones. The Disclosures state:

> **How Do You Apply My Payment?**  We will apply your payment to pay off lower-rate balances before paying off higher-rate balances.

(*Id*.) The Customer Agreement repeats:

> **How We Apply Your Payments.**
>
> We apply your minimum payments to lower Annual Percentage Rate balances before higher ones. We apply any portion of your payment, in

excess of your minimum payment, to higher Annual Percentage Rate
balances before lower ones.

(Murr Dep. Ex. 3 at PLTFMURR-059.)

The 0% offer that Murr received does not address how minimum payments will be

calculated or applied, but instead incorporates the Customer Agreement and states that "[a]ll

other terms and conditions for your account remain in full force and effect." (*See* Murr Dep. Ex.

5 at PLTFMURR-025.) In her deposition, Murr agreed that the 0% offer said nothing about

minimum payments. (Murr Dep. 75:10-16.)

**Grace periods**. The contractual terms regarding grace periods are set forth in every

monthly Statement Murr received for her account, along with the Disclosures and the Customer

Agreement. In each document, the terms provide that Murr will receive a monthly grace period

on purchases only if she pays her entire account balance the previous month.

The grace-period rule was conveyed to Murr most frequently in her monthly Statements,

which state on the back that Murr would receive a grace period on purchases "[e]ach month you

pay your 'New Balance' in full":

> **How can I <u>Avoid Paying Interest Charges?</u>** Each month you pay your "New
> Balance" in full, you will have a minimum grace period of 25 days with no
> interest charge on all new 1) purchases, 2) balance transfers, 3) special purchases
> and 4) other charges. If you have been paying your account in full with no interest
> charges applied and you do not pay your next bill in full, prorated interest charges
> will be assessed. There is no grace period on cash advances, special transfers, or
> on any new transaction when there is an unpaid balance from a previous bill.

(Murr Dep. Ex. 8 at MURR-COF-00004689.)[1]

---

[1] Statements from previous years expressed the same rule in slightly different language. They
stated: "**Grace Period.** You will have a minimum grace period of 25 days without finance
charge on new purchases, new balance transfers, new special purchases and new other charges if
you pay your total 'New Balance', in accordance with the important Notice for payments below,
and in time for it to be credited by your payment due date. There is no grace period on cash
advances and special transfers. In addition, there is no grace period on any transaction if you do
not pay the total 'New Balance.'" (Murr Dep. Ex. 4 at MURR-COF-00004503 (attached to
Terhaar Decl. at Ex. E); MURR-COF-00004517 (attached to Terhaar Decl. at Ex. L).)

The front of each Statement states the New Balance, labeled as such, along with the method of calculating it by adding together all transactions, fees, and interest on all segments of the account and subtracting all payments and credits:



(*Id.* at MURR-COF-00004688.)

The Disclosures and Customer Agreement repeat the same rule. The Disclosures state the rule in the Schumer Box (so named because of the Senator) required by the Truth In Lending Act:

| Grace period for repayment of the balance for purchases | 25 days from the date of the periodic statement on new purchases (provided you have paid your previous balance in full by the due date). |
|---|---|

(Murr Dep. Ex. 2 at MURR-COF-00004295.)

The Customer Agreement states the rule in the section addressing **Interest Charges and Fees**:

> We will charge *Interest Charges* and *Fees* to your *Account* as disclosed to you in your *Statements* and other *Truth in Lending Disclosures*. In general, *Interest Charges* begin to accrue from the day a transaction occurs. However, we will not charge you interest on any new balances posted to the purchase *Segment* of your *Account* provided you have paid your previous balance in full by the due date.

(Murr Dep. Ex. 3 at PLTFMURR-057.)

The 0% offer that Murr received also repeated the same rule:

> **Q. Can I avoid interest on new purchases after I transfer a balance?**
> **A.** Once you transfer a balance with this offer, you will pay interest on any new purchases you make with your credit card unless you pay your entire balance (including transferred balances) in full each month. Please see your Customer Agreement for details on interest Charges.

(Murr Dep. Ex. 5 at PLTFMURR-025.)

Murr testified that she believed the Q&A did not apply to her because she did not understand herself to be transferring a balance and that, apart from the Q&A, the 0% offer did not make any representations about the contractual grace period for purchases. (Murr Dep. 80:14-19, 81:5-12.) Murr did not check the Customer Agreement for details on interest charges as the Q&A advised her to do. (Murr Dep. 83:9-15.)

**Acceptance of the 0% offer.** Although Murr alleged in her Complaint that she "wrote an Access Check in the amount of $4,358.80 to pay for her property taxes" (Compl., Dkt. 1 at ¶ 9), she admitted at her deposition that her husband wrote the check instead:

> Q: So Mrs. Murr, Defendant's Exhibit 6 looks like a scanned copy of the check that was used to accept the 0 percent offer. Is that correct?
> A: Yes.
> Q: And whose handwriting is on this check?
> A: My husband.

(Murr Dep. at 26:21-27:7; *see also id.* at 27:8-15.) Murr is the account holder of her Capital One credit card, and Mr. Murr is only an authorized user. (*See* Murr Dep. at 13:6-16.)

The 0% offer expressly stated that only Murr could use the checks and that authorized users, like Mr. Murr, could not.

> • If you have an authorized user on your account, the authorized user cannot request a transfer or use any ch

(Murr Dep. Ex. 5 at PLTFMURR-24.) The Customer Agreement also prohibits authorized users from using access checks:

**Only the person we designate may use Access Checks.**

(Murr Dep. Ex. 3 at PLTFMURR-057.) Had Murr properly accepted the 0% offer, its terms would have become part of the contract under the terms of the Customer Agreement. (Murr Dep. Ex. 3 at PLTFMURR-55.)

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of Rule 56

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Michael v. Sentara Health Sys.*, 939 F. Supp. 1220, 1224 (E.D. Va. 1996).

## ARGUMENT

**I.   Capital One Is Entitled To Summary Judgment On All Of Murr's Claims For Breach Of Contract (Count III).**

Murr's claims for breach of contract fail for two independently sufficient reasons. First, Capital One was authorized by the contract governing Murr's account to take all the actions that Murr challenges as breaches. Second, Murr did not accept Capital One's 0% offer according to

its terms and thus has no contract to enforce as to that offer. For both reasons, Capital One is entitled to summary judgment.

### A.   The actions of Capital One that Murr challenges as breaches were all authorized by the contract governing her account.

Murr claims that Capital One breached its contract with her in three ways—by taking her 0% balance into account in calculating the amount of her monthly minimum payments, (Compl. Dkt. 1 ¶¶ 26, 95); by applying her minimum payments to the 0% balance instead of to her purchases, (*id.*); and by charging her interest on new purchases without a grace period when she had paid off her purchase balance but not her account balance the previous month, (*id.* at ¶¶ 24, 94). Each of these three actions was authorized by the contractual documents governing Murr's account, and Capital One is therefore entitled to summary judgment.

Murr asserts her claim for breach of contract under Virginia law. (Compl. Dkt. 1 ¶ 56.) Virginia law requires a plaintiff to prove three elements: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009). "In a breach of contract claim, the parties' contract becomes the law governing the case unless it is repugnant to some rule of law or public policy." *Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*, 662 S.E.2d 77, 80 (Va. 2008). Murr does not argue that any rule of law or public policy overrides her contract with Capital One, so the contract governs her claims. Each of her three alleged breaches fails on the contract's terms.

### 1.   Capital One properly calculated the amount of Murr's minimum payments.

First, the Truth in Lending Act ("TILA") Disclosures that Capital One sent to Murr when she opened her account authorized Capital One to consider Murr's entire balance in calculating the amount of her minimum payment:

**How Do You Calculate My Minimum Payment?** If your balance is less than $15, your minimum payment will equal your balance. Otherwise, your minimum payment will be the greater of $15 or 1% of your balance plus interest (periodic finance charges) and late payment fees.

(Murr Dep. Ex. 2 at MURR-COF-00004296.)

In her deposition, Murr admitted that nothing in the 0% offer addressed how minimum payments would be calculated. (Murr Dep. 75:10-16.) She further admitted that the offer did not promise "no interest, no payments." (Murr Dep. 76:23-77:2.) Thus, the rule on minimum payments was as stated in the Disclosures: Murr was required to pay 1% of her balance plus interest and late fees.

Capital One's contractual rule for calculating the amount of Murr's minimum payments arises directly out of federal banking regulations. In 2003, the Office of the Comptroller of the Currency ("OCC"), a regulatory body within the United States Treasury Department, published an interagency guidance paper announcing that "the Agencies expect lenders to require minimum payments that will amortize the current balance over a reasonable period of time." (Terhaar Decl. Ex. M at 3.) The OCC's policy of requiring minimum payments is a consumer protection measure to prevent the problem of protracted consumer debt. Though the OCC does not provide a formula for calculating the minimum payment, it has recommended that the minimum payment cover interest, fees, and at least one percent of the outstanding balance each month.

As Murr admits, Capital One set her minimum payments at the 1% -plus-interest-and-fees level recommended by the OCC—just as her contract provided. (Compl. Dkt. 1 ¶¶ 30, 48-49.) Her claim of breach based on the amount of the minimum payment thus fails on the undisputed facts.

**2.    Capital One properly applied Murr's minimum payments to her 0% balance.**

Both the Disclosures and the Customer Agreement also expressly authorized Capital One

to apply Murr's minimum payments to lower-rate balances before higher ones. The Disclosures

state:

> **How Do You Apply My Payment?**  We will apply your payment to pay off
> lower-rate balances before paying off higher-rate balances.

(*Id.*) The Customer Agreement repeats:

> **How We Apply Your Payments.**
>
> We apply your minimum payments to lower Annual Percentage
> Rate balances before higher ones. We apply any portion of your
> payment, in excess of your minimum payment, to higher Annual
> Percentage Rate balances before lower ones.

(Murr Dep. Ex. 3 at PLFTMURR-057.)

Capital One's contractual rule for applying minimum payments is consistent with and

allowed by federal banking law. Under § 104(b)(1) of the Credit CARD Act of 2009 ("CARD

Act"), Capital One is required to apply amounts "*in excess of the minimum payment* first to the

card balance bearing the highest rate of interest, and then to each successive balance bearing the

next highest rate of interest, until the payment is exhausted." 15 U.S.C. § 1666c(b)(1) (emphasis

added). Capital One is permitted, however, to apply the minimum payment itself to the lowest

APR balance.

It is undisputed that Capital One applied Murr's minimum payments first to her 0%

balance, and then to her higher-rate purchase balance, consistent with the unambiguous terms of

the contract. While Murr was carrying a 0% balance, Capital One applied the minimum payment

to that balance because it had the lowest rate. (*See* Murr Dep. Ex. 8 at MURR-COF00004698,

MURR-COF00004702, MURR-COF00004704, MURR-COF00004708, MURR-COF00004712,

MURR-COF00004716, MURR-COF00004720, MURR-COF00004724, MURR-COF00004726; MURR-COF-00004389). Once the minimum payment was applied, Capital One applied any excess payment to Murr's highest rate balance segment—here, her purchase balance. (*Id.*) Finally, after the purchase balance was eliminated, Capital One applied any remaining payment to the 0% balance. (*Id.*).

Because Capital One followed the contract with respect to the application of Murr's minimum payments, Murr's claim of breach fails on the undisputed facts.

> **3.**   **Capital One properly charged Murr interest on new purchases without a grace period after she began carrying a balance on her account.**

Finally, Murr's monthly Statements, Disclosures, and Customer Agreement all stated that Capital One would begin charging interest as soon as Murr borrowed money to make new purchases, without a grace period, after Murr began carrying a monthly balance on her account.

Murr's Monthly Statements, which are part of the contract under the Customer Agreement, (*see* Murr Dep. Ex. 3 at PLTFMURR-055), clearly communicate that a customer's grace period is contingent on paying the entire account balance each month. The Statements first declare that the customer will receive a grace period "[e]ach month you pay your 'New Balance' in full." (Murr Dep. Ex. 8 at MURR-COF-00004689.) They further state that, "If you have been paying your *account in full* with no interest charges applied and you do not pay your next *bill in full*, prorated interest charges will be assessed." (*Id.* (emphasis added).) As a previous federal court has held, this language unambiguously provides that "carrying a post-due balance— whatever its source—terminated cardmembers' right to the 25-day grace period." *Barton v. Capital One, Bank (USA), N.A.*, No. 12-cv-05412-JST, (N.D. Cal. Apr. 16, 2013) (Dkt. 43, Slip Op. at 6).

Under Virginia law, contractual terms must be construed according to their plain meaning. "Words that the parties used are normally given their usual, ordinary, and popular meaning." *Envt. Staffing Acquisition Corp. v. B&R Constr. Mgmt.*, 725 S.E.2d 550, 554 (Va. 2012). "The contract is construed as written, without adding terms that were not included by the parties." *PMA Capital Ins. Co. v. US Airways, Inc.*, 626 S.E.2d 369, 372 (Va. 2006). "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *D.C. McLain, Inc. v. Arlington Cnty.*, 452 S.E.2d 659, 662 (Va. 1995).

Murr testified that she never read this language on her monthly Statements until after Mr. Murr wrote the Access Check. (Murr Dep. 51:16-24.) But her decision not to read the language makes it no less binding. Murr "should have read" her contract. *People Life Ins. Co. v. Parker*, 20 S.E.2d 485, 487 (Va. 1942). "Whether [s]he did or not, [s]he is chargeable with notice of what it contained." *Id.*

Murr previously argued that the different words used to describe the grace-period rule in different places make its meaning ambiguous, but that is incorrect. The contract must be read as a whole, and the Court "must give effect to all of the language of a contract if its parts can be read together without conflict. . . . Its meaning is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties." *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983). Read as a whole, there is no way to interpret the grace-period rule other than to require Murr to pay her New Balance in full, including her 0% balance, to receive a grace period on purchases.

It is undisputed that, after the 0% offer balance posted to Murr's account in October 2012, Murr never paid her New Balance in full. (*See* Murr Dep. Ex. 8 at MURR-COF00004698,

MURR-COF00004702, MURR-COF00004704, MURR-COF00004708, MURR-COF00004712, MURR-COF00004716, MURR-COF00004720, MURR-COF00004724, MURR-COF00004726; MURR-COF-00004389 (reflecting payments less than the Previous Balance).) At all relevant times, the "general" rule from the Customer Agreement—that "*Interest Charges* begin to accrue from the day a transaction occurs," (Murr Dep. Ex. 5 at PLTFMURR-057)—thus governed Murr's account. Capital One applied this rule, and Murr's claims for breach of contract related to her grace period therefore fail on the undisputed facts.

> **B.    In the alternative, Murr did not accept the 0% offer and thus cannot sue for breach of its terms.**

An alternative basis for granting summary judgment to Capital One is the undisputed fact that Murr did not write the access check that purportedly accepted Capital One's 0% offer—her husband did—and he was precluded from using the check by the offer's plain terms. As a result, Murr cannot raise a claim for breach of contract because she never accepted the offer and therefore lacks standing to challenge its terms. *See Kroeze v. Chloride Grp. Ltd.*, 572 F.2d 1099, 1105 (5th Cir. 1978) (affirming dismissal of breach-of-contract claim because plaintiff did not accept offer on defendant's terms).

Under Virginia law, an offeror

> has a right to prescribe in his offer any conditions as to . . . mode of acceptance, or other matters, which it may please him to insert in and make a part thereof, and the acceptance to conclude the agreement must in every respect meet and correspond with the offer, neither falling within or going beyond the terms proposed, but exactly meeting them at all points and closing with these just as they stand.

*Chang v. First Colonial Sav. Bank*, 410 S.E.2d 928, 930 (Va. 1991). Here, the unambiguous terms of the 0% offer prescribed that only Murr could accept the offer, either by writing an access check, going online, or calling Capital One. (Murr Dep. Ex. 5 at PLTF-MURR-023.) Murr did not complete any of the three options for acceptance, and thus did not accept the offer at all.

The limitations Capital One placed on who could accept the 0% offer, as enumerated in the offer itself and in Murr's Customer Agreement, are absolute and cannot be rewritten. As the Virginia Supreme Court explained, courts "must interpret the agreement as written and are not free to rewrite its terms." *Mgmt. Enters., Inc. v. Thorncroft Co., Inc.*, 416 S.E.2d 229, 231 (Va. 1992). Courts applying Virginia law "will not rewrite contracts; parties to a contract will be held to the terms upon which they agreed." *Dewberry & Davis, Inc. v. C3NS, Inc.*, 732 S.E.2d 239, 243 (Va. 2012); *see also Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., Inc.*, 397 S.E.2d 876, 877-78 (Va. 1990).

Murr agreed in the Customer Agreement that Capital One could limit the changes an authorized user would be allowed to make to her account, including using access checks. (Murr Dep. Ex. 3 at 3 ("Only the person we designate may use *Access Checks*"); ("We may limit an *Authorized User's* ability to initiate certain transactions.").) She also did not have the authority to assign the offer to Mr. Murr. "When an offer is made to a particular person, the law is clear that no one else can accept the offer and it is not transferable by them to another." *Daru v. Martin*, 363 P.2d 61, 66 (Ariz. 1961).

For all these reasons, Murr did not form a contract with Capital One on the 0% offer and thus cannot assert a claim for breach of contract based on the offer's terms.

## II.     Capital One Is Entitled To Summary Judgment On All Of Murr's Claims For Fraud (Counts I, II, and VII).

As an alternative to her contract claims, Murr asserts two fraud claims under Virginia common law (Counts I and II) and a third under the Arizona Consumer Fraud Act ("Arizona CFA"), A.R.S. § 44-1521, *et seq.* (Count VII). Her argument as to each claim is that if the terms of her contract are as Capital One maintains, it defrauded her by not disclosing those terms in the 0% offer. These claims are preempted by the National Bank Act ("NBA") and its implementing

regulations. They also fail on their own terms because Capital One undisputedly disclosed in writing in the Disclosures, Customer Agreement, and monthly Statements, all the contractual terms that Murr claims were omitted.

> **A.** **Murr's fraud claims are based on alleged omissions and are therefore preempted by the National Bank Act and its implementing regulations.**

Congress enacted the NBA, 12 U.S.C. § 24, in 1864 to establish a national banking system free from conflicting state regulation. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314-15 (1978). Federal banking law expressly prescribes the disclosures that national banks like Capital One must make when they offer "checks that can be used to assess a credit card account." 12 C.F.R. § 1026.9(b)(3). To prevent patchwork state regulation on this and other topics, the regulations implementing the NBA expressly preempt "state law limitations concerning . . . [d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in . . . credit solicitations . . . or other credit-related documents." 12 C.F.R. § 7.4008(d)(8). Because Murr is trying to use state law to prescribe what Capital One must include in its access-check offers, her fraud claims are preempted, as another federal district court has previously held with respect to fraud claims challenging the same 0% offers at issue here. *See Barton*, Dkt. 43 at 11-12 (N.D. Cal. Apr. 15, 2013). Capital One is therefore entitled to summary judgment.

Under the NBA, a state law is preempted "whenever it conflicts with the laws of the United States or frustrates the purposes of the national legislation or impairs the efficiency of the [national] bank to discharge the duties for which it was created." *First Nat'l Bank v. California*, 262 U.S. 366, 369 (1923); *accord Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) (noting that "the States can exercise no control over [national banks], nor in any wise affect their operation, except in so far as Congress may see proper to permit"). Although courts ordinarily

apply a presumption against preemption, the rule is reversed under the NBA, where the "grants of both enumerated and incidental 'powers' to national banks [are interpreted] as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996).

One of the core banking powers authorized by the NBA that preempts contrary state law is "loaning money on personal security." 12 U.S.C. § 24 (Seventh). The NBA's implementing regulations—promulgated by the OCC—establish that, as part of this power, national banks may lend money "*without regard to state law limitations concerning . . . [d]isclosure and advertising*, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents." 12 C.F.R. § 7.4008(d)(8) (emphasis added). "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

Courts universally hold that the NBA and its implementing regulations preempt state-law fraud claims against national banks that are based on alleged omissions. The three decisions that are most closely on point are *Gutierrez v. Wells Fargo Bank*, 704 F.3d 712, 726 (9th Cir. 2012) (holding that imposing state-law liability "for the bank's failure to sufficiently disclose" is "tantamount to state regulation of disclosure requirements" and is therefore preempted); *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1034-36 (9th Cir. 2008) ("[P]urported duties to disclose . . . are preempted by the NBA and OCC regulations."); and *Barton*, Dkt. 43 at 11-12 (N.D. Cal. Apr. 15, 2013) (holding that the NBA preempted fraud claims brought against Capital One's 0% offers).

The Fourth Circuit has similarly recognized in two recent decisions that state laws which attempt to impose disclosure requirements on national banks are preempted. In 2013, the court held that a plaintiff's common law unconscionability claim was preempted under the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461 *et seq.*, and its implementing regulation, 12 C.F.R. § 560.2, which contain materially identical language to the "[d]isclosure and advertising" language in 12 C.F.R. § 7.4008(d)(8). *See McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 556 (4th Cir. 2013). The court rejected plaintiff's attempt "to impose new, substantive requirements on mortgage lenders," including with regard to "[d]isclosure and advertising." *Id.* at 556. Arguments based on a "simple failure to disclose," held the court, are preempted. *Id.* at 557. The Fourth Circuit previously recognized the same rule in *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315 (4th Cir. 2012). In that case, the court held that a state law prescribing various post-repossession notices on lenders was *not* preempted by the NBA, because the "disclosure[s]" referenced in 12 C.F.R. § 7.4008(d) "are related to the application for and extension of credit—not the collection of debt after the creditor/debtor relationship has been established." *Id.* at 324-25. The court expressly recognized, however, that a state law governing a true "disclosure"—an "informational statement of terms prior to entering a transaction"—would be preempted. *Id.* at 324.

Here, as in *Gutierrez, Rose, Barton*, and *McCauley*, each of Murr's fraud claims—including her Virginia common law claims and her Arizona consumer fraud claims—would "impose new, substantive [disclosure] requirements" on Capital One's power to "loan[] money on personal security." 12 U.S.C. § 24 (Seventh). Over and over in her Complaint, Murr faults Capital One for allegedly failing to disclose various details of its 0% offer. (*See* Compl. Dkt. 1 ¶ 27 ("Capital One never disclosed that it would apply monthly payments to special transfer

balances . . . ."), ¶ 30 ("Capital One never disclosed that as a result of accepting the 0% offer and

using an Access Check, Plaintiff [] will incur higher minimum payment requirements."), ¶ 44

("Nowhere in the 0% offer [] did Capital One state that it would eliminate the grace period

associated with Plaintiff's account unless she paid the entire purchase balance and special

transfer balance immediately and in full.").)

  In her deposition, Murr affirmed that her fraud claims are not based on any alleged

affirmative misrepresentation but on alleged omissions. As shown above, Murr conceded that she

received the promised 0% rate in exchange for the 2% fee, so her claim is not based on that

representation. (*See* Murr Dep. Ex. 8 at MURR-COF-4698 (0% interest), MURR-COF-4694 (2%

fee); Murr Dep. 40:21-41:1 (0% interest); 62:13-18 (2% fee).) Murr further testified that

statements in the offer such as "start saving now" and "the only thing worse than paying too

much interest is letting this offer expire" had no effect on her decision to accept the offer.

> Q: "Did . . . that first sentence ["The only thing worse than paying too much interest is letting this offer expire"] or this . . . offer to start saving or the bottom where it says, "This offer is good until November 4th, 2012, so start saving today," did any of those play any role in your decision to accept this offer?
> . . .
> A: No.
> Q: Is there anything in any of those sentences that made an actual offer to you . . . ?
> . . .
> A: Are you asking me as an advertising kind of a thing what's the most attractive piece of this piece of paper? 0 percent APR for 12 months, that's it.
> Q: And those other sentences that I just pointed to don't add anything to that?
> A: No, they don't.

(Murr Dep. 92:4-24; *see also* 90:11-92:3 (objections of plaintiffs' counsel omitted).)[2]

---

[2] Murr's testimony about these statements also provides two defenses for Capital One under state law. First, because Murr did not rely on the statements, they cannot serve as the basis for her fraud claims under either Virginia or Arizona law. *See ITT Hartford Grp., Inc. v. Va. Fin. Assocs., Inc.*, 520 S.E.2d 355, 361 (Va. 1999) (listing reliance as an element of a common-law fraud claim); *Riehle v. Bank of Am., N.A.*, No. CV-13-00251, 2013 WL 16944442, at *3 (D. Ariz. Apr. 18, 2013) (dismissing an Arizona CFA claim where plaintiff did not identify "a false

To the contrary, Murr testified clearly and repeatedly that her claims are based on alleged

omissions:

> Q:   So the problem isn't that they said you'll get a grace period and then
> didn't give it to you, the problem is that they just didn't let you know
> what happened?
> A:   Yeah, they didn't let you know.
> . . .
> Q:   What I understand you to be saying is that the problem with the offer,
> from your point of view, is that it didn't tell you what would happen with
> the minimum payment. That's one of the problems with this offer -- and
> it should have told you, is that right?
> A:   That's right.
> Q:   And that another of the problems with this offer, from your point of
> view, is that it didn't tell you what would happen to the grace period on
> purchases and it should have?
> A:   That's right.
> Q:   And so it's not that there's anything in here that said something that was
> wrong about the minimum payment?
> . . .
> A:   It was omission. It was a very, very big omission.

(Murr Dep. 84:21-25, 86:22-87:15.)

Because Murr has made it clear as a factual matter that her claims are based on alleged

omissions, federal law is clear that those claims are preempted by the NBA because the effect of

allowing Murr's claims to proceed would be to use Virginia and Arizona state law to force

Capital One to say something in its "credit-related documents" beyond what federal law requires.

*See Barton*, Dkt. 43 at 11-12 (N.D. Cal. Apr. 15, 2013). That is precisely what the NBA's

binding regulations and the Fourth Circuit's binding case law say that her claims may not do. *See*

12 C.F.R. § 7.4008(d)(8); *McCauley*, 710 F.3d at 556; *accord O'Donnell v. Bank of Am., Nat'l*

---

promise or representation on which she relied to her detriment"). Second, Murr's testimony
shows that the statements are puffery, which cannot support a claim under either Virginia law or
the Arizona CFA. *See Lambert v. Downtown Garage, Inc.*, 553 S.E.2d 714, 717 (Va. 2001);
*Larkey v. Health Net Life Ins. Co.*, No. 1 CA-CV 11-0523, 2012 WL 2154185, at *3 (Ariz. App.
June 14, 2012) ("Arizona courts have repeatedly held that a claim for fraud may not be based on
subjective characterizations of value, which are regarded as mere puffing."); *accord Law v.
Sidney*, 53 P.2d 64, 66 (Ariz. 1936) (stating that fraud "cannot be predicated upon the mere
expression of an opinion or upon representations in regard to matters of estimate or judgment"
and that "it is universally recognized a seller is apt to recommend an article or thing offered for
sale in more or less extravagant language").

*Ass'n*, 504 F. App'x 566, 568 (9th Cir. 2013) (holding that plaintiff's fraud claim was preempted because it "would force Bank of America to make additional disclosures"); *Gutierrez*, 704 F.3d at 726 (noting that "[t]he requirement to make particular disclosures falls squarely within the purview of federal banking regulation and is expressly preempted").

Federal law already pervasively regulates the issuance and administration of consumer credit cards, specifically including the disclosures that national banks like Capital One must make when they offer "checks that can be used to assess a credit card account." 12 C.F.R. § 1026.9(b)(3) (emphasis added). *See also* 15 U.S.C. § 1637(a) & (c) (required disclosures at account opening and in applications and solicitations), § 1637(b) (required information in monthly statements), § 1637(d) (required disclosures at renewal); 12 C.F.R. § 1026.5 (form and timing of disclosures), § 1026.6(b) (form, content, and timing of account-opening disclosures), § 1026.7(b) (form, content, and timing of statements).

Because federal law regulates the disclosures that Capital One must make in connection with offering credit and expressly preempts state-law claims that attempt to alter those requirements, summary judgment must be entered for Capital One against all of Murr's state-law fraud claims.

**B.     Capital One disclosed, in written contractual documents, every contractual term that Murr alleges was omitted, so her fraud claims fail on their own terms.**

In addition to being preempted, Murr's fraud claims fail on their own terms because the undisputed record shows that Capital One disclosed, in writing, in contractual documents, every contractual term that Murr alleges was omitted.

To sustain a claim for common law fraud in Virginia, a plaintiff must prove, by clear and convincing evidence, (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (7) upon which the misled party relied, and (8) resulting

damage. *See ITT Hartford*, 520 S.E.2d at 361. The concealment of a material fact can count as a false representation if the concealment was performed with knowledge "that the other party is acting on the assumption that no such fact exists." *Id.* "[C]oncealment always involves deliberate nondisclosure designed to prevent another from learning the truth." *Spence v. Griffin*, 372 S.E.2d 595, 599 (Va. 1988). A claim for constructive fraud has the same elements as fraud generally, but it relaxes the standard for intent, requiring only "a showing by clear and convincing evidence that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation." *Lumbermen's Underwriting Alliance v. Dave's Cabinet, Inc.*, 520 S.E.2d 362, 365 (Va. 1999).

The elements are similar for Murr's claim under the Arizona CFA, A.R.S. § 44-1522. "The three elements of a statutory [CFA] claim include a false promise or misrepresentation made in connection with the sale of merchandise and the [Murrs'] resulting and proximate injury." *Loomis v. U.S. Bank Home Mortg.*, 912 F. Supp. 2d 848, 856 (D. Ariz. 2012); *see also Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. App. 2004). The CFA prohibits the "concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission." A.R.S. § 44-1522(A).

Murr cannot satisfy the first element of all of her omission-based fraud claims—namely, that Capital One concealed a material fact from her. She alleges that Capital One failed to disclose the terms regarding minimum payments and grace periods, but the undisputed record shows that allegation to be incorrect. Capital One not only disclosed those terms, it did so in the very documents that make up its contract with Murr and that federal banking regulations required it to send, including the Disclosures, the Customer Agreement, and the monthly Statements. *See supra* at I.A. Murr cannot conceivably base an omissions claim on the allegation that the terms of

her contract were concealed from her when in fact the terms were disclosed, in writing, in the contractual documents, and Murr just failed to read them. *Cf. Shamberger v. Wells Fargo Bank, N.A.*, No. 3:13-cv-645, 2013 WL 6019248, at *5 (E.D. Va. Nov. 13, 2013) (dismissing Virginia concealment claim where plaintiff did "not describe what the lenders concealed or how he relied on it," and where he had "detailed information" about his loan from previous contractual documents). Summary judgment is therefore appropriate on all of Murr's fraud claims.

## III.    Capital One Is Entitled To Summary Judgment On All Of Murr's TILA Claims (Count V).

In Count V, Murr alleges, without elaboration, that Capital One violated various provisions of the Truth In Lending Act. (Dkt. 1 at ¶¶ 108-20.) Most of the alleged claims are time barred; the remainder fail on the merits.

### A.    Most of Murr's TILA claims are time barred.

Murr was required to bring her TILA claims "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e); *Roach v. Option One Mortg. Corp.*, 598 F. Supp. 2d 741, 750 (E.D. Va. 2009). Most of her claims are barred by that limitation.

Of the five paragraphs in Plaintiff's TILA count that cite specific statutory sections, three cite sections that apply only to account-opening disclosures. (Dkt. 1 at ¶¶ 114-16.) Paragraph 114 cites 15 U.S.C. §§ 1637(a)(1), (a)(2), (a)(3), and (a)(5), which collectively address the disclosures a creditor must make "[b]efore opening any account under an open end consumer credit plan." § 1637(a). Paragraphs 115 and 116 cite 15 U.S.C. §§ 1637(c)(6)(A)(ii) and § 1637(c)(6)(C)(i) and their accompanying regulations, which address the disclosures a creditor must make in "[a]n application or solicitation to open a credit card account," if the account has certain features. *Id.*

26

Murr brought this suit too late to raise claims challenging the disclosures she received at account opening. She opened her credit card account with Capital One in 2009 and received the required disclosures at that time. (Murr Dep. 15:14-17; Murr Dep. Ex. 2.) Had any violation of the TILA sections governing account openings occurred (none did), Murr was obliged to raise it in a suit no later than 2010. 15 U.S.C. § 1640(e). She did not meet that deadline. She brought this suit in 2013, (*see* Dkt. 1), and hence all of her TILA claims based on account-opening disclosure requirements are time barred.

**B.    The remaining TILA claims fail on the merits because Capital One did not change the terms governing repayment of an outstanding balance and did not charge a penalty for on-time payments.**

In the remaining two paragraphs of the Complaint that address TILA, Murr alleges that Capital One changed the terms governing repayment of her outstanding balance and also charged her a penalty for on-time payments. (Dkt. 1 at ¶¶ 117-18.) Both allegations are factually incorrect, so those claims fail as well.

In 15 U.S.C. § 1666i-1(c)(1), the Truth In Lending Act, as amended by the CARD Act, Pub. L. No. 111-24 (2009), provides that a "creditor shall not change the terms governing the repayment of any outstanding balance . . . ." The Complaint alleges that Capital One violated this provision by its "conduct described above," (Dkt. 1 at ¶ 116), which Capital One takes to mean the allegations regarding minimum payments and grace periods. If that is what the Complaint alleges, it is incorrect. As demonstrated above, Capital One followed the terms of its agreement regarding minimum payments and grace periods. It did not change those terms and did not violate § 1666i-1(c)(1).

Murr's final TILA claim is that "Capital One's conduct described above" violated 15 U.S.C. § 1637(j)(1)(A)-(B), which states that, with exceptions not relevant here,

27

> a creditor may not impose any finance charge on a credit card account . . . as a result of the loss of any time period provided by the creditor within which the obligor may repay any portion of the credit extended without incurring a finance charge, with respect to (A) any balances for days in billing cycles that precede the most recent billing cycle; or (B) any balances or portions thereof in the current billing cycle that were repaid within such time period.

Murr never explains how she thinks this section is applicable, and the undisputed record shows that Capital One did not impose finance changes for "any balances for days in billing cycles that precede the most recent billing cycle" or "any balances . . . in the current billing cycle that were repaid within" a grace period. Capital One charged interest on Murr's purchase balance only *after* Murr began carrying a balance and therefore was not entitled to a monthly grace period, as shown in her monthly Statements. (Murr Dep. Ex. 8.) It did not reach backwards and charge interest retroactively on balances that existed when Murr did receive a grace period. Murr therefore has no claim under TILA.

**IV.    Murr Does Not State A Claim Under The FCBA Because She Did Not Raise A "Billing Error" With Capital One (Count VI).**

Murr's final substantive claim is that Capital One violated the Fair Credit Billing Act ("FCBA") by failing to respond to a letter she sent to Capital One. (Compl. Dkt. 1 ¶¶ 124-131; Murr Dep. Ex. 9.) That claim fails because the letter did not allege any "billing error" within the meaning of the FCBA.

The FCBA provides that, if a debtor sends a proper written notice identifying a "billing error," the creditor must acknowledge and respond to the notice. 15 U.S.C. § 1666(a). Only certain types of disputes, however, are defined as a "billing error," 15 U.S.C. § 1666(b), and disputes over whether a creditor is entitled to charge interest and minimum payments are not among them. Billing errors are defined to include such things as computational errors and statements of charges the debtor did not make, made in a different amount, or made for goods

that the debtor later rejected. *Id.* Disagreements with a creditor over the terms of the credit-card agreement are not included in this list and are not like the errors that are included.

In *Esquibel v. Chase Manhattan Bank USA, N.A.*, 487 F. Supp. 2d 818 (S.D. Tex. 2007), *aff'd*, 276 Fed. Appx. 393 (5th Cir. 2008), the court dismissed an FCBA claim for reasons that apply equally here. The plaintiff had filed the claim based on the creditor's failure to respond to a letter disputing interest charges, late fees, and minimum payments. The court held that "[c]hallenges to the accuracy of finance charges and fees do not qualify as billing errors under the FCBA" and hence dismissed the claim. *Id.* at 829. The court recognized that its ruling "deprives consumers of the right to challenge the assessment of finance charges and fees under the billing error provisions of the FCBA," but noted that "[i]t is the statute itself, not the court, that leaves finance charges and fees out of the definition of billing error," and held that it could not "ignore the statutory scheme in favor of providing consumers with greater protection than that allowed by Congress." *Id.*; *see also Cunningham v. Bank One*, 487 F. Supp. 2d 1189, 1193 (W.D. Wash. 2007) (finding that finance charges do not constitute billing errors under the FCBA); *Langenfeld v. Chase Bank U.S., N.A.*, 537 F. Supp. 2d 1181, 1201 (N.D. Okla. 2008) (same).

Murr's letter, like the letter sent by the *Esquibel* plaintiff, does not allege any billing error within the meaning of the FCBA. As Murr testified at her deposition, her letter complained about just three issues: (1) the amount and application of her minimum payments; (2) the lack of a grace period on purchases after she began carrying a balance; and (3) the poor customer service Murr considered herself to have received when she called to complain. (Murr Dep. 117:6-24.) None of these complaints raises a billing error under § 1666(b), and hence none of them triggered any duties under the FCBA. Murr's FCBA claim should therefore be dismissed.

**V.      Murr's Claim For Declaratory Judgment Falls With Her Substantive Claims (Count VIII).**

Finally, Murr pleads a separate count asking the Court to enter a declaratory judgment in her favor. (Compl. Dkt. 1 ¶ 103.) Count VIII is a request for relief, not a separate cause of action, and it therefore falls with her substantive claims for the reasons given above.

The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, provides the sole basis for declaratory relief in federal courts. *See Zurich Ins. Co. v. Alvarez*, 669 F. Supp. 307, 308 (C.D. Cal. 1987); *see also McCorkle v. First Penn. Banking & Trust Co.*, 459 F.2d 243, 250 (4th Cir. 1982). It creates "an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

Murr's separate count for a declaratory judgment does not seek anything other than the relief requested in the other causes of action. (Compl. Dkt. 1 ¶¶ 144, 145.) Because those causes of action fail, so too does the request for declaratory relief.

<u>**CONCLUSION**</u>

For the foregoing reasons, summary judgment should be granted to Capital One for all of Murr's remaining claims.

Respectfully submitted,

**CAPITAL ONE BANK (USA), N.A.**

/s/ Mary C. Zinsner
Mary Catherine Zinsner (VSB No. 31397)
S. Mohsin Reza (VSB No. 75347)
TROUTMAN SANDERS LLP
1850 Towers Crescent Plaza, Suite 500
Tysons Corner, VA  22182
Telephone: (703) 734-4363
Facsimile: (703) 734-4340
E-mail: mary.zinsner@troutmansanders.com
E-mail: mohsin.reza@troutmansanders.com

David N. Anthony (VSB No. 31696)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA  23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
E-mail: david.anthony@troutmansanders.com

Aaron D. Van Oort (*pro hac vice*)
Eileen M. Hunter (*pro hac vice*)
Ryan J. Long (*pro hac vice*)
Peter C. Magnuson (*pro hac vice*)
Hanna L. Terhaar (*pro hac vice*)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone:  (612) 766 7000
Facsimile:  612 766 1600
E-mail: aaron.vanoort@faegrebd.com

*Counsel for Capital One Bank (U.S.A.) N.A.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that that on the 16th day of May, 2014, I filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic filing to the

registered CM/ECF users listed below:

Daniel M Cohen, Esq.
Robert J. Cynkar, Esq.
Cuneo Gilbert & LaDuca LLP (Alex)
211 North Union Street, Suite 100
Alexandria, VA 22314
(202) 789-3960
Fax: (202) 789-1813
danielc@cuneolaw.com
robertc@cuneolaw.com

Timothy G. Blood, Esq. (*pro hac vice*)
Thomas J. O'Reardon II, Esq. (*pro hac vice*)
Blood Hurst & O'Reardon, LLP
701 B Street, Suite 1700
San Diego, CA 92101
(619) 338-1100
Fax: (619) 338-1101
tblood@bholaw.com
toreardon@bholaw.com

Joseph P. Guglielmo, Esq. (*pro hac vice*)
Joseph D. Cohen, Esq. (*pro hac vice*)
Scott+Scott, Attorneys at Law, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
(212) 223-4478
Fax: (212) 223-6334
jguglielmo@scott-scott.com
jcohen@scott-scott.com

Luis Lorenzana, Esq. (*pro hac vice*)
Scott+Scott, Attorneys at Law, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565
Fax: (619) 233-0508
llorenzana@scott-scott.com

/s/ Mary C. Zinsner
Mary Catherine Zinsner (VSB No. 31397)
S. Mohsin Reza (VSB No. 75347)
TROUTMAN SANDERS LLP
1850 Towers Crescent Plaza, Suite 500
Tysons Corner, VA  22182
Telephone: (703) 734-4363
Facsimile: (703) 734-4340
E-mail: mary.zinsner@troutmansanders.com
E-mail:  mohsin.reza@troutmansanders.com

*Counsel for Capital One Bank (U.S.A.) N.A.*