IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MARGARET MURR,                          )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  )    1:13cv1091 (LMB/TCB)
                                        )
CAPITAL ONE BANK (USA), N.A.,           )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION

Before the Court is defendant's Motion for Summary
Judgment. For the reasons that follow, the motion will be
granted in part and denied in part.

### I.  BACKGROUND

Since 2009, plaintiff Margaret Murr ("plaintiff" or "Murr")
has maintained a credit card account with defendant Capital One
Bank (USA), N.A. ("defendant" or "Capital One"). During her
first three years as a cardholder, until October 2012, plaintiff
used her credit card for purely transactional purposes. That
is, plaintiff paid off purchases made on her card in full every
month without accruing interest charges pursuant to the terms of
her Credit Card Agreement ("CCA"), which entitles her to a 25-
day grace period in which she can avoid paying interest on her
purchases, provided that she pays off the balance from the
previous billing period in full by the due date.

In October 2012, plaintiff received a promotional offer
("the Offer") from defendant promising "0% APR for 12 months" on
balance transfers from other accounts and purchases made using
an "Access Check," three of which were attached to the Offer and
bore plaintiff's name and address.[1]  Compl. ¶¶ 18-20.  The Access
Checks allowed plaintiff to borrow up to a certain amount of
money — limited only by the total credit limit on her account —
at no interest for one year in exchange for a 2% up-front fee on
the amount borrowed.  Id.  Generally speaking, defendant
conceived of the Offer as a way to increase its relative market
share of consumer debt.  See Pl.'s Mem. in Supp. of Mot. for
Class Certification ("Pl.'s Mem."), Ex. 5, at 1 ("The objective
of the Balance Build programs is to profitably grow assets and
garner a larger share of wallet with our revolving customers.").
Defendant thus targeted the segment of its cardholders "already
carrying credit card debt or [those] who will have to incur that
debt for a new purchase."  Def.'s Mem. in Supp. of Its Mot. for
Summ. J. ("Def.'s Mem."), Ex. I.  As a cardholder who did not
routinely carry a balance, plaintiff was not a member of the
targeted segment.

---

[1] The Offer was sent to consumers nationwide in various
iterations, often with shorter promotional periods or higher
transaction fees; however, the essential terms remained the
same.  Further, some consumers accepted the Offer by writing a
"No Hassle Check," which is functionally identical to an "Access
Check."

On October 11, 2012, plaintiff directed her husband to write an Access Check for $4,358.80 to pay off their county property taxes.  That amount appeared on her next bill as a "special transfer balance," alongside her "purchase balance." See Compl. ¶ 47.  Her bill also reflected the one-time 2% transaction fee, which totaled $87.18.  Id.  Plaintiff thereafter sent defendant a payment equal to the transaction fee plus the full amount of all the purchases she had charged during the previous billing period.  Id.  Much to plaintiff's surprise, her next bill showed that the payment she had made left a small unpaid purchase balance, for which she was charged $11.31 in accumulated interest.

The source of plaintiff's surprise and confusion was two-fold.  First, plaintiff did not understand the Offer's effect on her interest-free grace period.  Because plaintiff did not pay off the Access Check balance in full after the first month, defendant deemed her to be carrying a balance and therefore eliminated her grace period for new purchases.  In other words, by carrying a balance at the end of the billing period due to her use of the Access Check, plaintiff incurred interest at the standard rate (13.9% APR) on new purchases from the day they were made, even though defendant did not charge interest on the Access Check balance.  Defendant claims that this loss of the

3

25-day grace period was dictated by the terms of the CCA, which states in relevant part:

> **Interest Charges and Fees.**  We will charge Interest Charges and Fees to your Account as disclosed to you in your Statements and other Truth in Lending Disclosures.  In general, Interest Charges begin to accrue from the day a transaction occurs.  However, we will not charge you interest on any new balances posted to the purchase Segment of your Account provided you have paid your previous balance in full by the due date.

Def.'s Mem., Ex. B, at 6 (emphasis in original).  Defendant further claims that the only way plaintiff could have restored her grace period under the CCA was to pay off everything — the amount of the Access Check and all purchases plus accumulated interest and fees.

Plaintiff was not alone in finding the Offer and its consequences to be confusing.  Documents uncovered in discovery reveal that defendant was aware of a steady stream of complaints from consumers who lost their grace periods after accepting the Offer despite paying off their purchase balances in full. Moreover, just one month after plaintiff received the Offer in the mail, defendant reached a settlement agreement with the Vermont Attorney General to more clearly disclose "how accepting a Vermont Access Check Offer will affect the interest paid on future purchases made" by cardholders, like plaintiff, who do not routinely carry a balance.  Pl.'s Mem., Ex. 33.

4

The second source of confusion was the manner in which defendant allocated plaintiff's payments among her balances. Her October 2012 bill, for instance, showed a minimum required payment of $48.00, or 1% of the total balance on her account (plus interest and fees). Although plaintiff made a payment of $450.24, which covered the entire amount of purchases charged plus the 2% transaction fee, the first $48.00 of that payment was applied to her Access Check balance — rather than her purchase balance — meaning $48.00 of plaintiff's purchase balance remained unpaid. As a consequence, interest accrued on the remaining purchase balance even though those purchases had been made before plaintiff lost her grace period.

Defendant claims that this allocation method is spelled out in the CCA, which states:

> **How We Apply Your Payments.**  We apply your minimum payments to lower Annual Percentage Rate balances before higher ones.  We apply any portion of your payment, in excess of your minimum payment, to higher Annual Percentage Rate balances before lower ones.

Def.'s Mem., Ex. B, at 6 (emphasis in original).  Plaintiff continued to use her credit card to make purchases throughout November 2012.  At the close of the next billing period, she again attempted to pay off the entire amount of her purchase balance plus $11.31 in accrued interest charges (but none of the Access Check balance).  Compl. ¶ 48.  Her payment again fell

5

short of achieving that goal because defendant allocated the
minimum payment to the Access Check balance.  Finding this to be
unfair, plaintiff stopped using her credit card to make
purchases and similarly stopped making any substantial attempts
to pay off her balance.  Id. ¶¶ 49-51.

As a result of defendant's practices, although plaintiff
did not incur any interest charges on her Access Check balance,
she did incur unexpected interest charges on new purchases in
the amount of $26.16 due to her loss of a grace period and the
manner in which defendant allocated her payments.  In July 2013,
after plaintiff had refused to make payments for several months,
defendant charged off her account.  In August 2013, plaintiff
paid $4,368.50 of the $4,535.89 that she owed, and defendant
elected not to pursue the remainder.

On August 30, 2013, plaintiff initiated this class action.[2]
The Complaint makes myriad allegations based on what plaintiff
describes as defendant's bait-and-switch tactics.  In
particular, plaintiff alleges that defendant eliminated her
grace period on new purchases, wrongly and without notice, when
she accepted the Offer.  See Compl. ¶¶ 3, 28.  Plaintiff further
alleges that defendant "manufactured" a shortfall in her
payments by diverting a certain amount of them to her Access

---

[2] The proposed class has not yet been certified.

Check balance, thereby causing a portion of her purchases to go unpaid and accrue unexpected interest charges. Id. ¶ 3. Finally, plaintiff alleges that none of these consequences were made apparent to her at the time she accepted the Offer by writing an Access Check. Nor was it clear that the only way to avoid incurring interest charges would be to pay the entire balance of the Access Check right away or refrain from making any new purchases until doing so.

As a result, the Complaint alleges that plaintiff has suffered injury in the form of "improperly incurred interest charges," late fees, and loss of the interest-free grace period associated with her credit card. Id. ¶ 57. Plaintiff has also "been the subject of derogatory credit reports and suffered negative credit consequences, and has been harassed by debt collectors." Id. ¶ 56. She has made claims against defendant for common law fraud and constructive fraud (Counts I and II); breach of contract and the implied covenant of good faith and fair dealing (Counts III and IV); violating the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. (Count V); violating the Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666 (Count VI); violating the Arizona Consumer Fraud Act ("ACFA"), Ariz. Rev. Stat. Ann. § 44-1521 et seq. (Count VII); and for declaratory relief (Count VIII).

7

On October 18, 2013, defendant moved to dismiss the entire Complaint for failure to state a claim upon which relief can be granted. On November 15, 2013, the Court granted defendant's motion as to plaintiff's claim that defendant breached the implied covenant of good faith and fair dealing (Count IV), but denied the rest of defendant's motion.

## II. DISCUSSION

Defendant has moved for summary judgment on all remaining counts. Plaintiff has responded to the motion and the parties have argued their positions during a hearing before the Court.

### A. Standard of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Accordingly, the question on summary judgment is "whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant[.]" In re Apex Express, 190 F.3d 624, 633 (4th Cir. 1999). To survive a summary judgment motion, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate

8

to support a jury verdict." Thompson Everett, Inc. v. Nat'l
Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (citation
omitted). That means the non-moving party may not rest upon a
"mere scintilla" of evidence, but must instead offer specific
facts supporting its position. See Celotex, 477 U.S. at 324;
accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252
(1986). In other words, once the moving party demonstrates that
it is entitled to judgment as a matter of law, the burden shifts
to the non-moving party to identify facts showing that there is
a genuine issue for trial. See Pulliam Inv. Co. v. Cameo Prop.,
810 F.2d 1282, 1286 (4th Cir. 1987).

### B. Common Law Fraud (Counts I and II)

Plaintiff asserts two fraud claims under Virginia common
law, both of which rely on the same underlying facts. Count I
alleges that defendant fraudulently induced plaintiff to accept
the Offer by misrepresenting its terms and concealing material
information relating to its costs. Compl. ¶¶ 72-76. Count II
alleges that those same misrepresentations and efforts to
conceal constitute constructive fraud. Id. ¶¶ 82-86. Defendant
argues that it is entitled to summary judgment on both counts
because plaintiff's claims are preempted by federal law and,
even if they are not preempted, "fail on their own terms"
because defendant disclosed "all the contractual terms that

9

[plaintiff alleges] were omitted" in various governing
documents.  Def.'s Mem., at 18-19, 24-25.

### 1. Preemption

The threshold issue is whether plaintiff's common law
claims are preempted by the National Banking Act ("NBA"), 12
U.S.C § 24.  Congress enacted the NBA to establish a federal
banking system and to simultaneously shelter it from conflicting
regulations at the state level.  See Marquette Nat'l Bank v.
First of Omaha Serv. Corp., 439 U.S. 299, 314-15 (1978).  To
this end, the NBA preempts state law "whenever it conflicts with
the laws of the United States or frustrates the purposes of the
national legislation or impairs the efficiency of the [national]
bank to discharge the duties for which it was created," First
Nat'l Bank v. California, 262 U.S. 366, 369 (1923), which
includes state law that imposes particular disclosure
requirements beyond those required by federal law, see Gutierrez
v. Wells Fargo Bank, N.A., 704 F.3d 712, 726 (9th Cir. 2012);
see also 12 C.F.R. § 7.4008(d)(8) (allowing national banks to
extend credit offers to consumers "without regard to state law
limitations concerning . . . [d]isclosures and advertising,
including laws requiring specific statements, information, or
other content to be included in . . . credit solicitations . . .
or other credit-related documents").  The NBA does not, however,

preempt state law insofar as the latter only creates liability for intentional and affirmative misrepresentations. See McCauley v. Home Loan Inv. Bank, F.S.B., 710 F.3d 551, 556 (4th Cir. 2013). Here, defendant argues that holding it liable for fraud under Virginia common law is tantamount to imposing greater disclosure requirements; plaintiff responds that her claims only relate to an affirmative misrepresentation (or active concealment of relevant facts) in the Offer.

Because the parties are in agreement that omission claims are preempted but misrepresentation claims are not, resolution of this issue turns on where plaintiff's claims fall on the spectrum. Reading the Complaint generously, plaintiff appears to allege that the actionable fraud occurred when defendant induced her to accept the Offer by creating the palpable but false perception that doing so represented a favorable financial opportunity, even if the Offer did not specify any measurable benefits. See Pl.'s Mem., Ex. 4 ("The only thing worse than paying too much in interest is letting this offer expire."); id. ("You have until November 4, 2012, to start saving . . . ."). In other words, defendant presented plaintiff with an Offer that it characterized as beneficial without providing sufficient information to allow plaintiff to evaluate that claim for herself. And that characterization worked to conceal the fact

11

that plaintiff only stood to "save" money if she paid off the entire Access Check within one month of writing it; otherwise, she would lose her grace period and start paying interest on purchases, which is what happened.

For consumers like plaintiff, who had not been paying any interest on new purchases, the Offer most likely did not amount to an opportunity to "start saving." Thus, in light of defendant's description of the benefits of the Offer, plaintiff rests her case on a theory of misrepresentation that is not subject to preemption.

Defendant resists this conclusion by pointing out that plaintiff has at various turns spoken largely in terms of omissions — that is, plaintiff has specifically complained of the failure to disclose the loss of the grace period and the calculation and application of minimum payments in the Offer. Defendant also cites Barton v. Capital One Bank (USA), N.A., No. 12-cv-05412 (N.D. Cal. Apr. 15, 2013), a case involving a plaintiff who received nearly identical promotional materials from defendant and transferred a balance in reliance thereon. Among other claims, Barton alleged that defendant's solicitations constituted an "unfair" or "fraudulent" practice, in violation of California's Unfair Competition Law. The district court held that such a claim was "preempted by the NBA

insofar as [plaintiff] seeks to impose affirmative disclosure requirements on Defendant that exceed those required by federal law." Id. at 11-12 (citing Gutierrez, 704 F.3d at 726). Barton did not, however, involve any common law fraud claims, nor did the district court perform a substantive analysis of Barton's statutory fraud claim. Accordingly, Barton is easily distinguished and therefore not sufficiently instructive to compel the conclusion that plaintiff's fraud claims are preempted.

## 2. Merits of the Fraud Claims

To prevail on an actual fraud claim under Virginia law, a plaintiff must prove by clear and convincing evidence "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Evaluation Res. Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994). Virginia law also recognizes an action for constructive fraud where misrepresentations are made with reckless abandon and disregard for the truth rather than specific fraudulent intent. See Bradley v. Tolson, 85 S.E. 466, 467 (Va. 1915). Constructive fraud differs from actual fraud only in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or

13

negligently.  The plaintiff must still prove the other elements
of actual fraud — reliance and detriment — by clear and
convincing evidence.  See Alequin, 439 S.E.2d at 390.  Finally,
concealing or omitting a material fact can also give rise to a
claim of actual fraud.  Although silence does not constitute
fraud in the absence of a duty to disclose, cf. Norris v.
Mitchell, 495 S.E.2d 809, 812-13 (Va. 1998), "[c]oncealment of a
material fact by one who knows that the other party is acting
upon the assumption that the fact does not exist constitutes
actionable fraud," Allen Realty Corp. v. Holbert, 318 S.E.2d
592, 597 (Va. 1984); see also Carlucci v. Han, 907 F. Supp. 2d
709, 740 (E.D. Va. 2012) (requiring actual intent to conceal a
material fact).

Here, plaintiff identifies two allegedly actionable
statements: first, defendant's statement "that a 0% APR would be
applied to Access Check amounts during the promotional period,"
and second, defendant's statement that acceptees of the Offer
would save money without clarifying that some consumers would
also "lose their grace periods unless they immediately pa[id]
off the special transfer balance, purchase balance, and any
interest."  See Compl. ¶¶ 73, 83.  Defendant responds that all
such information can be found in the CCA, TILA disclosures, and

14

monthly statements, causing plaintiff's fraud claims "to fail on their own terms." See Def.'s Mem., at 25.

The first statement is not actionable under any theory of fraud because it is true and therefore fails at the first step of the analysis. See Alequin, 439 S.E.2d at 390 (holding that a plaintiff must prove the falsity of a challenged representation). All of the relevant monthly statements plaintiff received after she accepted the Offer clearly show that defendant never charged plaintiff interest on her Access Check balance. See Def.'s Mem., Ex. H. Instead, the financial injuries plaintiff complains of derive entirely from interest charged on her purchases (due to her failure to compensate for the allocation of her minimum payments to the Access Check balance and loss of the grace period). Her Access Check balance never grew during the promotional period — that is, she could have paid it off at any point for no more than the amount she initially borrowed.

The second statement, however, is actionable because it constitutes "[c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist." Allen, 318 S.E.2d at 597. It is clear from the evidence in the record that defendant knew consumers like plaintiff, who regularly availed themselves of the grace period

15

by paying off the entire balance for the previous month's purchases, would mistakenly assume "that Balance Transfers . . . [were] completely separate from their purchases and therefore [did] not impact the interest applied to those purchases." Pl.'s Mem., Ex. 9, at 3. Indeed, defendant's customer service representatives reported "fielding a lot of upset . . . calls" to that effect. Id.; see also Pl.'s Mem., Exs. 18-19, 21. Compelling evidence therefore exists that defendant knew a distinct subset of its customers were acting upon the assumption that their grace periods would be unaffected by accepting the Offer, as long as they continued to pay off all their new purchases every month, even though that assumption was false.

It is a little less clear that defendant intentionally prevented such customers from discovering that they would lose their grace periods if they did not pay off the entire balance of an Access Check. See Spence v. Griffin, 372 S.E.2d 595, 599 (Va. 1988) (explaining that "concealment always involves deliberate nondisclosure designed to prevent another from learning the truth"). There is, however, enough evidence in the record to create a question of fact on that issue for the jury. Among the strongest evidence of intent is an internal memorandum, in which defendant's Chief Credit Officer ("CCO")

16

voiced "concerns about response rates" to similar offers in
light of plans to attach "a notice that customers will lose
purchase grace until their entire balance is paid if they accept
the offer." Pl.'s Mem., Ex. 5, at 4. Defendant's CCO expressed
"hope[] that a combination of wording and segmentation changes
[could] be made to lessen the impacts" of the new disclosure.
Id. This evidence at least suggests an intent to keep consumers
in the dark regarding the true costs of the Offer. In addition,
email exchanges between customer service representatives and
their supervisors indicate that defendant adopted a less-than-
forthcoming approach to obvious consumer confusion. Pl.'s Mem.,
Exs. 18-19. One exchange is particularly emblematic: "I think
we would be stupid to tell customers [about the loss of the
grace period] without them asking about it. Clearly we wouldn't
want to lie, but I don't think we need to be overt about it."
Pl.'s Mem., Ex. 18, at 1. Such evidence supports plaintiff's
claim that defendant manifested deliberate indifference to the
revelation that certain consumers accepted the Offer with the
mistaken assumption that their grace periods would be
unaffected, and it is therefore sufficient to defeat summary
judgment.

Defendant offers only the tepid counterargument that
plaintiff cannot prove concealment because any consumer willing

to sift through the multitude of documents governing her account would have discovered all of "the terms regarding minimum payments and grace periods" somewhere therein. Def.'s Mem., at 25. That response, without more, is insufficient to avoid a jury trial on the issue. Accordingly, plaintiff's fraud claims will go forward.

## C. Breach of Contract (Count III)

Plaintiff claims that defendant breached the terms of the CCA — as modified by the Offer — by eliminating the grace period for new purchases, by applying part of her payments to the Access Check balance before the purchase balance, and by using her Access Check balance to calculate the amount of her minimum monthly payments. Compl. ¶¶ 24-26, 93-96. In moving for summary judgment, defendant argues that the terms governing plaintiff's account entitle her to a grace period only if she pays her entire previous balance, not just the portion of it arising from purchases, by the end of the billing period. Def.'s Mem., at 15-17. Similarly, defendant argues that it complied with the CCA and other governing documents in calculating and applying plaintiff's minimum payments. Id. at 12-15. In the alternative, defendant argues that plaintiff herself does not have standing to enforce the contract because she did not write the Access Check in question. Id. at 17.

18

The three elements of a breach-of-contract action in Virginia are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Ulloa v. QSP, Inc., 624 S.E.2d 43, 48 (Va. 2006) (quoting Filak v. George, 594 S.E.2d 610, 614 (Va. 2004)). In such an action, courts must treat the parties' contract as "the law governing the case unless it is repugnant to some rule of law or public policy." Palmer & Palmer Co. v. Waterfront Marine Constr., Inc., 662 S.E.2d 77, 80 (Va. 2008). To that end, the rules of contract interpretation in Virginia provide that the words used must be given their ordinary and usual meaning and, more generally, that contracts must be interpreted as written. See Mgmt. Enters., Inc. v. Thorncroft Co., Inc., 416 S.E.2d 229, 231 (Va. 1992). Ambiguities must be "construed against the drafter," Martin & Martin v. Bradley Enters., 504 S.E.2d 849, 851 (Va. 1998), though the mere fact that parties disagree over a contract's terms does not necessarily render those terms ambiguous. Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984) ("Contracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by [the parties] in expressing their agreement.").

19

Here, the parties dispute the meaning of several provisions of the CCA, presenting the Court with a pure issue of contract interpretation.  In deciding whether summary judgment is appropriate, the Court thus "faces a conceptually difficult task":

> Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations.  The first step for a Court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face.  If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.  Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.  If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

World-Wide Rights Ltd. v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992) (internal quotation marks and citations omitted).

### 1. Grace Period

The Court must first determine whether the CCA is ambiguous regarding the effect of carrying an Access Check balance on a

cardholder's grace period for new purchases. The CCA reads in relevant part:

> **Interest Charges and Fees.** We will charge Interest Charges and Fees to your Account as disclosed to you in your Statements and other Truth in Lending Disclosures. In general, Interest Charges begin to accrue from the day a transaction occurs. However, we will not charge you interest on any new balances posted to the purchase Segment of your Account provided you have paid your previous balance in full by the due date.

Def.'s Mem., Ex. D, at 5 (emphasis in original). Both parties agree that plaintiff became entitled to a 25-day interest-free grace period for new purchases upon paying her "previous balance" in full when it came due. They disagree, however, as to the meaning of "previous balance" — that is, they disagree as to what balance or balances must be paid for plaintiff to retain the grace period for purchases. Plaintiff contends that the term "previous balance" encompasses only the "purchase balance," see Compl. ¶ 94, based on defendant's practice of distinguishing between account segments — i.e., purchases, special transfers, balance transfers, and cash advances — which "are subject to unique pricing, grace periods or other terms" elsewhere in the CCA, see Pl.'s Mem. in Opp. ("Pl.'s Opp."), at 14. At the very least, plaintiff contends that the term "previous balance" is ambiguous inasmuch as it does not identify any of the four segments by name. See Martin, 504 S.E.2d at 851 (construing

21

ambiguities against the drafter).  Defendant responds that
"previous balance" clearly encompasses balances for all of these
segments.

The Court concludes that the CCA is sufficiently ambiguous
on this point to allow the issue to go to trial.  Much of the
ambiguity derives from the segmentation of an individual
cardholder's account.  Accordingly, when defendant promises "not
[to] charge . . . interest on any new balances posted to the
purchase Segment" of an account on the condition that the
cardholder has "paid [her] previous balance in full by the due
date," it is not unreasonable to understand the second
appearance of "balance" as likewise referring to the purchase
balance.  After all, words are shaped by the context in which
they appear.  If defendant had meant "balance" to encompass
balances for all segments of an account, not just the "purchase
Segment," it could have easily written the relevant provision to
clearly state that a cardholder only gets the benefit of a grace
period on the condition that she has paid the total of all
balances incurred through her use of the account.  Instead, by
merely using "previous" rather than a segment-specific term to
modify the latter appearance of "balance," defendant rendered
the provision ambiguous on its face.

22

Defendant tries to avoid this conclusion by arguing that the CCA must be read in conjunction with the TILA disclosures and monthly statements, both of which are incorporated by reference. Def.'s Mem., Ex. D, at 1 ("Your Account with us is governed by . . . (2) all Statements . . . [and] (7) all disclosures and materials provided to you before or when you opened your Account, including Truth in Lending Disclosures . . . ."). These documents, in turn, purport to shed additional light on the interplay between the Offer and a cardholder's grace period. For instance, the monthly statements sent to plaintiff provide:

> **How can I avoid paying <u>Interest Charges</u>?** Each month you pay your "New Balance" in full, you will have a minimum grace period of 25 days with no interest charge on all new 1) purchases, 2) balance transfers, 3) special purchases and 4) other charges. If you have been paying your account in full with no interest charges applied and you do not pay your next bill in full, prorated interest charges will be assessed. There is no grace period on cash advances, special transfers, or on any new transaction when there is an unpaid balance from a previous bill.

Def.'s Mem., Ex. E (emphasis in original). This disclosure hardly cures the ambiguity that arises when the CCA is read as a whole, because as with the CCA, the monthly statements do not explicitly reference Access Checks, even though they specify numerous other account activities — i.e., "purchases," "balance transfers," "special purchases," "other charges," "cash

23

advances," and "special transfers." See <u>Berry v. Klinger</u>, 300 S.E.2d 792, 796 (Va. 1983) (holding that a contract's "meaning is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties"). The monthly statements ultimately invite more confusion than they resolve. For example, in the first such statement issued to plaintiff after the Offer was accepted, there is an apparent discrepancy in the balance numbers. While the "Transactions" section includes the Access Check, written on October 11 in the amount of $4,358.80, the "Interest Charge Calculation" section lists a balance of only $2,662.01 for special transactions, of which the Access Check is considered a part. Pl.'s Mem., Ex. 12. The discrepancy is not explained, nor does the monthly statement clarify how, if at all, carrying a balance on an Access Check will affect the grace period.

Defendant also points to a section of the Offer entitled "frequently asked questions," but it suffers from the same defect by failing to mention Access Checks by name. The relevant section states:

> **Q: Can I avoid interest on new purchases after I transfer a balance?**
>
> **A:** Once you transfer a balance with this offer, you will pay interest on any new purchases you make with your credit card unless you pay your entire balance (including transferred balances) in full each month.

> Please see your Customer Agreement for details on
> Interest Charges.

Pl.'s Mem., Ex. 4 (emphasis in original).  As above, this

disclosure does not make any specific reference to the Access

Checks by which plaintiff accepted the Offer and eventually lost

her grace period.  To the extent defendant argues that Access

Checks are technically "special transfers" under the CCA, the

Offer itself distinguishes between "writ[ing] a check" and

"transfer[ing] a balance."  Moreover, the discrepancy in the

monthly statements defeats any argument that such a definition

clarifies the Offer.  In sum, no amount of hindsight analysis

can make clear what plaintiff had to do to avoid losing her

grace period.

Having determined that the contract is ambiguous, an

examination of evidence extrinsic to the contract only

complicates the interpretive issue, leaving "genuine issues of

fact respecting the contract's proper interpretation" for the

jury.  See World-Wide Rights, 955 F.2d at 245.  This evidence

includes reports from defendant's customer service

representatives, many of whom did not themselves understand the

terms of the Offer, describing a large volume of consumer

complaints regarding defendant's interpretation and application

of the provisions in question.  See Pl.'s Mem., Ex. 18, 21.

Defendant even held multiple training sessions to educate its

employees on how balance and special transfers, including use of
Access Checks, affected grace periods and how to break the bad
news to confused consumers.  Pl.'s Mem., Ex. 9, at 19 ("It is
important to use empathy when handling these calls because
interest charges are not typical for these customers."); see
also id. at 23 ("This can seem confusing or unfair to a
customer, so be empathetic.").  Such evidence simply confirms
that the proper interpretation of the contract cannot be
resolved on summary judgment.

### 2. Minimum Payments

There is also sufficient evidence in the record to permit
plaintiff's breach-of-contract claim to go forward, based on
defendant's allegedly improper calculation and application of
her minimum monthly payments.

Regarding calculation, the CCA itself is generally silent,
instead directing the cardholder to consult her monthly
statements, which "provide instructions for making payments,
including the amounts due and the due date for receiving your
payment."  Def.'s Mem., Ex. D, at 8.  Although the monthly
statements prominently show the required minimum payment next to
the date the payment is due, for information on the method of
calculation, a cardholder must look to the TILA disclosures,
which explain that a cardholder's "minimum payment will be the

greater of $15 or 1% of [her] balance plus interest . . . and late payment fees." Def.'s Mem., Ex. C. Again, the breadth of the term "balance" is unclear in the absence of any specific reference to account segments. A reasonable person could read the calculation provision to be based on a cardholder's purchase balance or, in the alternative, to be based on a cardholder's balance across all segments of her account. Accordingly, the provision is at least ambiguous and questions regarding its proper interpretation must be submitted to the jury.

Regarding how payments are applied, the CCA explains:

**How We Apply Your Payments.** We apply your minimum payments to lower Annual Percentage Rate balances before higher ones. We apply any portion of your payment, in excess of your minimum payment, to higher Annual Percentage Rate balance before lower ones.

Def.'s Mem., Ex. D, at 11 (emphasis in original). Unlike other provisions, this one clearly acknowledges that a cardholder's account has different balances; however, it is still susceptible to multiple interpretations and therefore ambiguous. The source of ambiguity is the phrase "lower Annual Percentage Rate balances." Here, plaintiff carried an Access Check balance with 0% interest. Thus, it would not be unreasonable for a consumer to understand that phrase to mean that minimum payments are only applied to those balances on which some actual rate of interest is being charged, thereby excluding balances on which no

27

interest is being charged, as with plaintiff's Access Check
balance. The TILA disclosures reiterating that plaintiff's
payments would be used "to pay off lower-rate balances before
paying off higher-rate balances" do not resolve the confusion.
Def.'s Mem., Ex. C. The presence of ambiguous language and the
absence of dispositive extrinsic evidence compel the Court to
conclude that this claim must be sent to the jury as well.

On one point, plaintiff's claim can be resolved on summary
judgment, and that is her argument that the Offer constituted an
"implicit" promise not to require any payment on the principal
for the duration of the promotional no-interest period. See
Pl.'s Opp., at 10. That claim is not supported by the record.
The Court will therefore decline the invitation to add a term —
that defendant lent a sum certain for a set period of time
without requiring any repayment of the principal — that does not
appear in any contractual document. Accordingly, on this one
aspect of plaintiff's breach-of-contract claim, summary judgment
will be granted in defendant's favor.

### 3. Plaintiff's Standing

Following the revelation in discovery that plaintiff's
husband — rather than plaintiff herself — wrote and signed the
Access Check in question, defendant has moved for summary
judgment on the alternative ground that plaintiff "cannot raise

a claim for breach of contract because she never accepted the Offer and therefore lacks standing to challenge its terms." Def.'s Mem., at 17.

In Virginia, a party who makes an offer "has a right to prescribe in his offer any conditions as to . . . mode of acceptance, or other matters, which it may please him to insert in and make a part thereof, and the acceptance to conclude the agreement must in every respect meet and correspond with the offer . . . ." Chang v. First Colonial Sav. Bank, 410 S.E.2d 928, 930 (Va. 1991). Defendant exercised that right here. The Offer was personally addressed to "Margaret Murr" and the three enclosed Access Checks were printed with just her name and address; they did not mention her husband. Pl.'s Mem., Ex. 4. Moreover, the fourth bullet in the section entitled "Important Information About This Offer" stated that an "authorized user cannot request a transfer or use any check" even though such person is entitled to hold an additional card on the cardholder's account. Id. The condition as to mode of acceptance comports with the CCA, in which defendant reserved the right to "limit an Authorized User's ability to initiate certain transactions." Def.'s Mem., Ex. D, at 5.

Although the record clearly shows that defendant did not extend the Offer to plaintiff's husband, defendant nevertheless

acquiesced to plaintiff's husband's use of the Access Check by allowing the transaction to proceed. Indeed, there is no evidence in the record that defendant ever tried to nullify the transaction, and Maricopa County accepted the Access Check as payment for the Murrs' property tax bill. By its conduct, defendant has therefore waived any argument that plaintiff lacks standing to bring this claim.

### D. Truth in Lending Act (Count V)

Plaintiff claims that defendant failed to disclose the conditions and consequences of accepting the Offer and improperly assessed finance charges, both in violation of TILA, 15 U.S.C. § 1601 et seq., as amended by the Credit CARD Act of 2009, id. § 1666i-1(c)(1). Compl. ¶¶ 114-18. Defendant moves for summary judgment on the grounds that most of plaintiff's TILA claims are time-barred and those that are not fail because defendant "did not change the terms governing repayment of an outstanding balance." Def.'s Mem., at 26-27.

Congress enacted TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to [her] and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. To effectuate TILA's purpose, courts must construe "the Act's provisions liberally in favor of

30

the consumer" and demand absolute compliance by creditors.  See
In re Ferrell, 539 F.3d 1186, 1189 (9th Cir. 2008).
Consequently, creditors are required not only to disclose
certain essential terms when an account is opened, but to do so
accurately.  This requirement forbids literal falsities as well
as misleading statements.  See Rossman v. Fleet Bank (R.I.) Nat.
Ass'n, 280 F.3d 384, 390-91 (3d Cir. 2002).  Under TILA and its
implementing regulations, the applicable standard is whether
initial disclosure is made in a "clear and conspicuous" fashion.
See 15 U.S.C. §§ 1605(a), 1632(a); 12 C.F.R. § 226.4(a).  In
other words, disclosure must be made "in a reasonably
understandable form and readily noticeable to the consumer."
Rubio v. Capital One Bank, 613 F.3d 1195, 1203 (9th Cir. 2010).

     As a threshold matter, defendant correctly argues that any
claim must be brought "within one year from the date of the
occurrence of the [TILA] violation."  15 U.S.C. § 1640(e)
(establishing a one-year statute of limitations period
applicable to claims for civil damages).  Plaintiff is therefore
barred from bringing claims based on violations arising from
defendant's failure to make appropriate disclosures at the time
she opened her credit card account, now more than four years
ago; however, plaintiff relies on two other provisions of TILA
that are not linked to the opening of an account.  The first

such provision prohibits a creditor from "chang[ing] the terms governing the repayment of any outstanding balance." Id. § 1666i-1(c)(1). The second provision similarly prohibits a creditor from "impos[ing] any finance charge on a credit card account . . . as a result of the loss of any time period provided by the creditor within which the obligor may repay any portion of the credit extended without incurring a finance charge, with respect to . . . any balances or portions thereof in the current billing cycle that were repaid within such time period." Id. § 1637(j)1)(A)-(B). Defendant has ongoing obligations to its customers under both provisions.

Plaintiff alleges that she remained entitled to the 25-day grace period upon timely paying off her entire purchase balance at the end of the October 2012 billing period and that defendant wrongly terminated her grace period in the November 2012 billing period. Those allegations fall within the scope of both TILA provisions. As discussed above, whether termination of the grace period constituted a "change of terms," id. § 1666i-1(c)(1), and whether charging interest on new purchases constituted improper "finance charges," id. § 1637(j)(1)(A)-(B), are factual issues to be decided at trial. Because the Complaint was filed in August 2013, within one year of the disputed actions, these TILA claims are not time-barred.

Moreover, plaintiff makes a strong argument that defendant remained subject to continuing disclosure obligations under other TILA provisions, including §§ 1632(a) and 1637(a).  If those obligations do not spring forth from the letter of the law, they surely spring forth from its spirit.  Id. § 1601 (explaining that one purpose of the Act is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit").  The evidence in the record clearly establishes a material factual dispute regarding whether the financial consequences of the Offer were disclosed in the "clear and conspicuous" fashion required by TILA.  See id. §§ 1632(a), 1637.  Also, the jury must determine whether the promise of 0% APR was accompanied by appropriate warnings about the inevitable trade-offs in the form of new interest charges for those consumers who did not previously carry a balance month-to-month.  Given that the jury will be made up of ordinary consumers, their view of the evidence is a particularly sound indicator of whether defendant met its burden under TILA.

Although defendant included in the Offer a cautionary note to consumers that "transferring a balance" would result in paying "interest on any new purchases you make with your credit

33

card unless you pay your entire balance (including transferred balances) in full each month," Pl.'s Mem., Ex. 4, a similar caution was not included about using an Access Check. And, as covered previously, even if plaintiff had read the Offer's fine print in combination with disparate sections of the CCA and earlier disclosures, whether such documents would have enabled her to understand exactly what terms applied to use of an Access Check and how to avoid subsequent interest charges remains a triable issue of fact.

This degree of overly complex and qualified disclosure is the very kind TILA seeks to avoid. Put simply, the Offer could reasonably be seen as deceptive or misleading to a readily identifiable group of consumers, which is anathema to the Act's purpose. Accordingly, pursuant to a liberal construction of TILA's provisions, Ferrell, 539 F.3d at 1189, and a clear policy statement disfavoring the uninformed use of credit, 15 U.S.C. § 1601, plaintiff's claim will go forward.

### E. Fair Credit Billing Act (Count VI)

Plaintiff claims that defendant failed to respond to her notice of billing errors in a satisfactory manner, in violation of the FCBA, id. § 1666. Compl. ¶¶ 125-29. Defendant responds that summary judgment is appropriate because plaintiff has not identified any actual billing error. Def.'s Mem., at 28.

The FCBA was enacted to protect consumers against unfair and inaccurate credit billing practices by mandating billing dispute procedures for creditors to follow.  To effectuate that purpose, courts have held that the FCBA is to be liberally construed and its requirements strictly enforced.  Grant v. Imperial Motors, 539 F.2d 506, 510 (5th Cir. 1976).  To succeed on an FCBA claim, a plaintiff must show "(1) the existence of a billing error, (2) timely notification of the billing error, and (3) failure of the bank issuing the card to comply with the procedural requirements of § 1666."  Beaumont v. Citibank (South Dakota) N.A., 2002 WL 483431, at *3 (S.D.N.Y. March 28, 2002).  A billing error consists of any of the following:

> (1)   A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.
>
> (2)   A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.
>
> (3)   A reflection on a statement of goods or services not accepted by the obligor of his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction.
>
> (4)   The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.

(5)    A computation error or similar error of an accounting nature of the creditor on a statement.

(6)    Failure to transmit the statement required under section 1637(b) of this title to the last address of the obligor which has been disclosed to the creditor, unless that address was furnished less than twenty days before the end of the billing cycle for which the statement is required.

(7)    Any other error described in regulations of the Board.

15 U.S.C. § 1666(b). If a cardholder sends a written notice of any such error within sixty days of receiving a bill, the FCBA requires a creditor to acknowledge the dispute within thirty days, investigate the matter, and provide a written explanation of its decision within ninety days. Id. § 1666(a).

Plaintiff sent a letter to defendant on November 3, 2012, contesting the interest charges that appeared on her account after she used the Access Check and the manner in which her payments were applied across her balances. See Pl.'s Mem., Ex. 14. Plaintiff alleges that she never received a satisfactory reply. Regardless, her claim comes up short because she has not produced evidence that defendant committed one of the billing errors enumerated in the FCBA. Id. § 1666(b). The monthly statements plainly show that defendant billed plaintiff's account according to what it thought proper based on her activities, Def.'s Mem., Ex. E, albeit using a formula that

36

plaintiff did not understand and that may have been deceptive. Because there is no evidence of a technical error — that is, a miscomputation or other unintended charge — appearing anywhere in the record and plaintiff has not pointed to any authority suggesting that challenges to the propriety of interest charges, late fees, and minimum payments satisfy the first element of an FCBA claim, summary judgment will be granted in defendant's favor on this count.

### F. Arizona Consumer Fraud Act (Count VII)

Plaintiff claims that defendant used deceptive means to entice her to accept the Offer "and to thereby expose [herself] to excessive interest charges, late fees and minimum payment requirements," Compl. ¶ 137, in violation of the ACFA, Ariz. Rev. Stat. Ann. § 44-1522 et seq. Defendant moves for summary judgment on the grounds that plaintiff's claim is preempted by the NBA and that all of the relevant terms were disclosed to her. Def.'s Mem., at 18.

The Arizona statute provides:

> The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

37

Ariz. Rev. Stat. Ann. § 44-1522(A). Based on this language, the two elements of a cause of action under the ACFA "are any deception, deceptive act or practice . . . , false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." Dunlap v. Jimmy GMC of Tucson, Inc., 666 P.2d 83, 87 (Ariz. Ct. App. 1983). Arizona courts have held that the statute is to be read broadly. See, e.g., Madsen v. Western American Mortg. Co., 694 P.2d 1228, 1232 (Ariz. Ct. App. 1985). In that spirit, "the term 'deceptive' has been interpreted to include representations that have a 'tendency and capacity' to convey misleading impressions to consumers even though interpretations that would not be misleading also are possible." Id. (citation omitted). The relevant impressions arise from "all that is reasonably implied, not just from what is said, and in evaluating the representations, the test is whether the least sophisticated reader would be misled." Id. (citations omitted). "Technical correctness" will not forgive a defendant's representations "if the capacity to mislead is found." Id. (citation omitted).

The elements of an ACFA claim largely mirror the elements of a common law fraud claim in Virginia, see supra, save for one important difference: the former uses more expansive terms,

38

including "deception," which cover conduct that may not rise to the level of a "false representation" in Virginia.  In other words, the ACFA erects a lower hurdle for consumers taking a run at creditors.  Accordingly, for all the reasons stated in the discussion of plaintiff's fraud claims, including that such claims are based on a theory of misrepresentation and therefore not preempted by the NBA, plaintiff's ACFA claim necessarily survives.  In sum, plaintiff's evidence to date sufficiently shows, at a minimum, that the Offer had "a 'tendency and capacity' to convey misleading impressions to consumers." Madsen, 694 P.2d at 1232.  Whether defendant failed to explain, forthrightly and in a conspicuous manner, all the consequences of accepting the Offer and how to avoid the most harmful effects of acceptance are appropriate questions of fact for a jury to decide.

### G. Declaratory Relief (Count VIII)

Plaintiff seeks a declaration of her rights against defendant arising from the latter's alleged violations of law pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a). Compl. ¶ 145.  Defendant does not (and cannot) dispute the availability of declaratory relief as a possible remedy in this action, but nevertheless argues that it should not be a separate cause of action.  Def.'s Mem., at 30.  Although technically correct, defendant's point is purely a matter of form rather

than substance.  Plaintiff's claim will go forward based on the clear possibility of obtaining such a remedy.

### III.  CONCLUSION

For all these reasons, defendant's Motion for Summary Judgment [Dkt. No. 71] will be granted as to Count III (Breach of Contract) to the extent plaintiff claims she was not required to make any minimum monthly payment whatsoever on the Access Check balance and as to Count VI (Fair Credit Billing Act); defendant's motion will be denied in all other respects by an appropriate Order to be issued with this Memorandum Opinion.

Entered this _27_ day of June, 2014.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge